501 A.2d 48

**CONSUMER PROTECTION DIVISION OFFICE OF the ATTORNEY GENERAL**

v.

**CONSUMER PUBLISHING COMPANY, INC.**

**No. 88, Sept. Term, 1984.**

Court of Appeals of Maryland.

Dec. 13, 1985.

Motion for Reconsideration Denied Jan. 29, 1986.

Diana G. Motz, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., William Leibovici, Cathy Cobbs, Asst. Attys. Gen., on brief), Baltimore, for appellant & cross appellee.

Henry R. Lord and Cynthia J. Morris, Baltimore, for appellee & cross appellant.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

ELDRIDGE, Judge.

We granted certiorari in this case to resolve several issues under the Maryland Consumer Protection Act, Maryland Code (1975, 1983 Repl.Vol.), Title 13 of the Commercial Law Article.

Consumer Publishing Company is an Ohio corporation which, under various names, sells "diet" pill plans through the mails. The active ingredient in the pills sold by the Company is phenylpropanolamine hydrochloride (PPA). The Company has promoted its products with full-page advertisements in Maryland newspapers and has made sales to consumers in Maryland. On May 20, 1981, the Consumer Protection Division of the Office of the Attorney General

filed charges against the Company alleging that its advertisements offering pills for sale in Maryland contained false and misleading statements in violation of the Maryland Consumer Protection Act.

At the administrative hearing on these charges, the Division presented two witnesses: (1) Dr. Thaddeus E. Prout, Chief of Medicine at the Greater Baltimore Medical Center, Associate Professor of Medicine at the Johns Hopkins University School of Medicine and former Chairman of a Food and Drug Administration advisory committee on anti-obesity drugs; and (2) Dr. Thomas Pozefsky, Assistant Professor of Medicine at the Johns Hopkins University School of Medicine and a private practitioner specializing in the treatment of patients with weight problems. Both Dr. Prout and Dr. Pozefsky explained that the major components of a successful weight loss program are consumption of less calories than are burned in normal activities, continued motivation, and behavior modification. Dr. Prout testified that the successful treatment of obesity occurs in an extremely small number of cases. Both doctors agreed that permanent weight loss is comparatively rare because of the underlying psychological need to eat.

Dr. Prout testified that PPA has been available for 20 years and is primarily a nasal decongestant. He further stated that there is no evidence that it significantly affects hunger and that its effect on weight loss is trivial. In his opinion, PPA is "not an effective agent in weight loss," and he cited clinical studies which indicated that weight loss due to taking PPA is approximately six ounces per week. Dr. Pozefsky testified that a weight loss of about one half pound per week for four weeks is the maximum which can be expected from taking PPA. He also testified that in his opinion excessive appetite is probably not a significant cause of obesity.

The Division introduced as exhibits the following: four advertisements which had run between January 7, 1979, and March 22, 1981; examples of the pills and accompanying

materials sent to consumers; an OTC Miscellaneous Internal Drug Product Panel Study of weight control products; and portions of a publication entitled AMA Drug Evaluations.

The Company called Dr. Bartley G. Hoebel, Assistant Professor of Psychology at Princeton University and an expert in obesity. Dr. Hoebel testified that PPA is an effective appetite suppressant and that it is statistically effective in helping people lose weight, although he stated that he was not testifying as to clinical effectiveness and he could not say that PPA would work for everyone. He acknowledged that there is no data regarding the effects of PPA over long periods of time. Dr. Hoebel also admitted that typical weight loss in his studies of PPA was less drastic than the weight loss described in the Company's advertisements. The Company also submitted studies which Dr. Hoebel had relied on, at least some of which were financed by a manufacturer of PPA.

The hearing officer, Professor Charles Shafer of the University of Baltimore School of Law, was specially appointed for the administrative hearing. He submitted proposed findings of fact, conclusions of law and a proposed order based on the evidence. The Company then filed exceptions to the proposed findings and order, and a hearing on the exceptions was held before H. Robert Erwin, then Chief of the Consumer Protection Division. Following that hearing, both parties filed additional factual and legal material for Mr. Erwin's consideration. After some delay, Mr. Erwin issued his ruling on the exceptions and a final order on April 13, 1983.

The final order adopted most of the findings of fact and conclusions of law proposed by the hearing officer. Based on these findings it ordered the Company to cease and desist from representing 1) that its diet plan consists primarily of taking any pill or tablet when, in fact, the plan also includes a low-calorie diet program, 2) that use of the pill or plan will cause a reduction in weight without the

need to exercise individual will power, 3) that the use of any appetite suppressant, the primary ingredient of which is PPA, will prevent hunger, or end the cause of hunger, or prevent excessive consumption of food, 4) that pills, the primary ingredient of which is PPA, are recent medical discoveries or have only recently been used in diet programs, 5) that pills, whose primary ingredient is PPA, will increase the body's metabolic rate or will otherwise increase the rate at which the body converts fat cells to energy, 6) that use of the pills or plan will result in a significant weight loss for substantially all users when in fact it will not for at least 50% of the users, 7) that users of the pills or plan may expect to experience certain amounts of weight or inches lost without indicating weight or inches lost by the typical prospective purchaser with the kind of supervision typically received, and 8) that the pill or plan has been the subject of scientific, academic, or clinical testing which proves its value as a weight loss program unless such tests are generally accepted in the medical community as demonstrating the value of the pill or plan in the treatment of obesity.

The final order required affirmative disclosures in future advertising, including disclosure of the active ingredients of the pills and a bold-faced notice stating that "DIETING IS REQUIRED." The order also required the Company to restore "the initial purchase price, including postage, of such products (excluding reorders)" to all residents of Maryland who had purchased the products between May 19, 1978, and December 31, 1981. Finally, the order required the Company to make available to the Division business records which identify Maryland consumers entitled to such restitution.

The Company sought review of the order in the Circuit Court for Baltimore City. Hearings were held before the court on February 7, 8 and 9, 1984, and additional evidence was received. In a judgment entered on February 21, 1984, the circuit court vacated the Division's final order and substituted a new order allowing the Division to enforce the

terms of an agreement which had been entered between the Company and the United States Postal Service. The trial judge found that the Company's constitutional rights under the First Amendment and the Fourteenth Amendment had been violated and that "the record is insufficient to support a factual basis for the rejection of the [Company's] exceptions." The Division filed an order of appeal from that judgment on March 14, 1984.

On March 21, 1984, the Company filed a motion for revision of the judgment under former Maryland Rule 625(a),[1] requesting costs and reasonable expenses, including attorney's fees. The Company contended that the proceeding against it was initiated in bad faith and without substantial justification, entitling it to costs and reasonable expenses in accordance with former Maryland Rule 604b.[2] The circuit court denied the motion on the ground that the court was without jurisdiction to revise an order from which an appeal had been taken. The Company filed an order of appeal from this denial.

Before any proceedings in the Court of Special Appeals, we granted a petition for a writ of certiorari, bringing both appeals before this Court. In its appeal, the Division argues that the circuit court exceeded its authority by substituting its own remedy for the Division's order and erred by improperly admitting additional evidence at the trial. The Division also argues that the Company's constitutional rights were not violated and that the Division's findings and final order are supported by the record. The Company responds by defending the circuit court's action and by asserting that the administrative order was subject to reversal on various grounds. In addition, the Company has filed a motion to dismiss the Division's appeal.

---

**1.** The current version is new Maryland Rule 2–535(a), effective July 1, 1984.

**2.** The current version is new Maryland Rule 1–341, effective July 1, 1984.

I.

■ Preliminarily, the Company argues in its motion to dismiss that the Consumer Protection Division of the Office of the Attorney General has no authority to seek review of the circuit court's decision. The Company relies on a line of cases, beginning with *Zoning Appeals Board v. McKinney*, 174 Md. 551, 199 A. 540 (1938), in which this Court has taken the position that certain administrative agencies acting in a "quasi-judicial" capacity cannot appeal the reversal of their decisions by a circuit court, unless the authority to appeal is specifically provided by statute. *See, e.g., County Comm'rs of Carroll Co. v. Gross*, 301 Md. 473, 483 A.2d 755 (1984); *Maryland Board v. Armacost*, 286 Md. 353, 355, 407 A.2d 1148 (1979); *Employment Sec. Adm. v. Smith*, 282 Md. 267, 269–270, 383 A.2d 1108, 1110 (1978); *Board of Landscape Architects v. McWilliams*, 270 Md. 383, 311 A.2d 792 (1973); *Liquor License Board v. Leone*, 249 Md. 263, 239 A.2d 82 (1968); *Md. Pharmacy Board v. Peco*, 234 Md. 200, 202–203, 198 A.2d 273, 274 (1964). The rationale for these decisions is set forth in *Zoning Appeals Board v. McKinney, supra,* where this Court concluded that a zoning board had no authority to appeal from a court order reversing its decision to grant a building permit. After examining the statutory provisions governing the zoning board, the Court stated that the Board exercises a function which

"is in its nature judicial. It grants or withholds highly valuable privileges accordingly as it from evidence finds the existence of facts which justify one course or the other. It has no executive duties, it formulates no policies, its function is merely to find facts, to apply to those facts rules of law prescribed by the Legislature, and to announce the result. It has no interest, personal or official, in the matters which come before it other than to decide them according to the law and the proved fact, and it is in no sense a party to such proceedings." 174 Md. at 560–561, 199 A. 540.

The Court went on to state that the nature and character of the agency "preclude[d] the hypothesis that the legislature intended that it should have the power to engage in litigation involving the legality or propriety of its decisions" and that

" . . . the Board has no more right to appeal from its own decisions to the Baltimore City Court, or, from the decisions of that court to the Court of Appeals, than a justice of the peace, or such an agency as the State Industrial Accident Commission, would have to appeal from the judgments of a court reversing their decisions." (*Id.* at 562).

Later, in *Md. Pharmacy Board v. Peco, supra,* the Court held that the Board of Pharmacy did not in the case before it qualify as an "aggrieved party" because the statutory function exercised in the case was "quasi-judicial and not adversary" and that the Board was "only a party in the circuit court for the purpose of producing the record . . . or notifying the parties 'to the proceeding before it.' " 234 Md. at 202, 198 A.2d 273.

On the other hand, this Court has always recognized that the *McKinney* doctrine does not apply to all agencies. In *McKinney* itself the Court said (174 Md. at 561):

"There are administrative boards and agencies, such as the State Tax Commission and the Public Service Commission, the functions of which are so identified with the execution of some definite public policy as the representative of the State, that their participation in litigation affecting their decisions is regarded by the Legislature as essential to the adequate protection of the State's interests."

In particular, the *McKinney* doctrine has never been applied to a governing body or a constitutional officer in the Executive Branch of the State Government. We have held that the City of Baltimore may appeal the reversal of decisions of the Board of Municipal and Zoning Appeals of Baltimore. *Baltimore City v. Borinsky,* 239 Md. 611, 212

A.2d 508 (1965); *Mayor & C.C. of Balto. v. Shapiro*, 187 Md. 623, 51 A.2d 273 (1947). Because "the City has a legitimate interest in the effectuation of its policies," 239 Md. at 616, 212 A.2d 508, it also has an interest in the outcome of litigation involving a City zoning ordinance.

In *County Comm'rs of Carroll Co. v. Gross, supra*, 301 Md. 473, 483 A.2d 755, we recently held that *McKinney* does not apply to a board of county commissioners. In that case, the Board of County Commissioners of Carroll County sought to intervene as of right in an appeal to the circuit court from the board of zoning appeals of that county. Gross argued that, under *McKinney* and its progeny, the Board could not intervene. This Court held that *McKinney* did not apply and that the Board had a right to intervene. The Court quoted extensively from Judge Wilner's opinion for the Court of Special Appeals in *Bd. of Co. Comm'rs v. H. Manny Holtz, Inc.*, 60 Md.App. 133, 143–144, 481 A.2d 513 (1984), where it was said that

> "the board of county commissioners ... functions as the county government. It is the county body politic ... [exercising] legislative, quasi-legislative, executive and quasi-judicial authority, sometimes in combination.
>
> "To equate this unique body with an administrative zoning board whose jurisdiction and concern is carefully circumscribed would be ... unrealistic ...."

*See Md. Port Adm. v. C.J. Langenfelder*, 50 Md.App. 525, 438 A.2d 1374 (1982) (the Maryland Port Administration, an administrative unit within the State Department of Transportation may seek judicial review of decisions of the Department's Board of Contract Appeals).

The Consumer Protection Division of the Office of the Attorney General is not the kind of non-adversarial, quasi-judicial agency contemplated by *McKinney, Peco* and their progeny. The Division is part of the Attorney General's office, and the ultimate administrative authority is the Attorney General himself. The Attorney General is a constitutional officer, Maryland Constitution, Art. V, whose duties include prosecuting and defending cases on behalf of

the State in order to promote the State's policies and protect its rights. *State v. Burning Tree Club,* 301 Md. 9, 34, 481 A.2d 785 (1984). The Consumer Protection Division acts as an arm of the Attorney General, entrusted with broad powers to enforce and interpret the Consumer Protection Act, Code (1975, 1983 Repl. Vol.), Title 13 of the Commercial Law Article, and with a mandate to protect and promote the welfare of consumers.

The statutory powers of the Division include the power to receive and investigate consumer complaints, initiate its own investigation of any possibly unfair and deceptive trade practice, issue cease and desist orders, adopt rules and regulations which further define unfair or deceptive trade practices or otherwise effectuate the purposes of the Act, and seek a temporary or permanent injunction in a civil enforcement proceeding. §§ 13–204 and 13–403(c)(2). The statute further provides that the Division may "[e]xercise and perform any other function, power and duty appropriate to protect and promote the welfare of consumers." § 13–204(11).

In regulations promulgated pursuant to statutory authority, §§ 13–204(12) and 13–205, the Division sets forth the Rules of Practice and Procedure governing cease and desist order hearings. These regulations provide that in cases such as the one at bar, where the Division itself initiates an investigation, the Division is the party proponent. COMAR 02.01.02.14B. The party proponent has the obligation of demonstrating probable cause that a violation of the Consumer Protection laws has occurred. COMAR 02.01.02.14C. The regulations further provide that in cases where the Division itself acts as the party proponent, "the Attorney General shall appoint a special hearing officer to conduct the proceedings who has had no prior contact or information with respect to the proceedings." COMAR 02.01.02.14D. The statute and the regulations promulgated under it contemplate an adversarial proceeding, with the Division prosecuting its case at the hearing as a party. In this case the Division served pleadings on the Company, cross-examined

Company witnesses, made legal arguments and filed briefs. In sum, the Consumer Protection Division functions as a civil prosecutor.

The Consumer Protection Division exercises a broad range of functions including rulemaking, investigating and prosecuting alleged violators of the statute, and holding cease and desist order hearings. The functions of the Division are closely "identified with the execution of ... public policy as the representative of the state." *McKinney, supra,* 174 Md. at 561, 199 A. 540. With its many different functions, its mandate to protect consumers and its role as a representative of the interests of the State, the Division is not the type of agency to which the rationale of *McKinney* applies. It has a strong interest in the outcome of its case against the Consumer Publishing Company, a case which it initiated and vigorously prosecuted. The Division is clearly aggrieved by the reversal of its order by the circuit court and, therefore, may seek appellate review of the circuit court's decision.[3]

## II.

The Consumer Protection Division argues that the circuit court exceeded its statutory authority by substituting its own remedy for the Division's final order. The Division also argues that the trial court erred by considering and relying on evidence which was not in the administrative record.

## A.

■ When the case was in the court below, the Administrative Procedure Act, former Art. 41, § 255(f), provided

---

**3.** Even if the Division did fall within the rationale of the *McKinney* and *Peco* cases, it could still appeal on the issue of whether or not the trial judge exceeded his statutory authority. In *Peco, supra,* 234 Md. at 202, 198 A.2d 273, this Court recognized that even non-adversarial quasi-judicial agencies may appeal when the trial court has exceeded its jurisdiction or statutory authority. For the reasons set forth in Part IIA of this opinion, *infra,* it is clear that the circuit court in this case exceeded its authority.

that a circuit court reviewing an agency decision could affirm, remand, reverse or modify the administrative order.[4] In this case, the circuit court, after reversing the Division's final order, ordered that "the agreement entered into by the Appellants with the United States Postal Service be substituted therefor." We hold that this action exceeded the trial court's statutory authority.

The Company argues that the circuit court's substitution of the Postal Service agreement fell within the statutory authority to "modify" the administrative order. In our view, the authority to "modify" cannot be stretched to include replacing the agency's order with an entirely distinct one based on an agreement between the Company and the Federal Government. Furthermore, in a proceeding such as this, it is the function of the Consumer Protection Division to determine the appropriate remedy for violations of the Consumer Protection Act. By substituting the Postal Service Agreement for the Division's order, the circuit court usurped that function. As this Court said in *O'Donnell v. Bassler,* 289 Md. 501, 509–511, 425 A.2d 1003 (1981):

> "It is a fundamental principle of administrative law that a reviewing court should not substitute its judgment for the expertise of the administrative agency from which the appeal is taken. *Courtney v. Board of Trustees of*

---

**4.** The full text of the provision was as follows:
"—The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional provisions; or
 (2) In excess of the statutory authority or jurisdiction of the agency; or
 (3) Made upon unlawful procedure; or
 (4) Affected by other error of law; or
 (5) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or
 (6) Arbitrary or capricious."
The current version is codified in Maryland Code (1984), § 10–215(g) of the State Government Article, effective October 1, 1984. The substance of the provision is unchanged.

*the Md. State Retirement Systems,* 285 Md. 356, 362, 402 A.2d 885, 889 (1979); *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 394–96, 396 A.2d 1080, 1089 (1979); . . . . This principle underlies the rule that if an administrative function remains to be performed after a reviewing court has determined that an administrative agency has made an error of law, the court ordinarily may not modify the agency order. Under such circumstances, the court should remand the matter to the administrative agency without modification. *South Prairie Constr. Co. v. Local No. 627, IUOE,* 425 U.S. 800, 805–06, 96 S.Ct. 1842, 1844–45 [48 L.Ed.2d 382] (1976); *NLRB v. Food Employees Local 347,* 417 U.S. 1, 9–11, 94 S.Ct. 2074, 2079–80 [40 L.Ed.2d 612] (1974); *FPC v. Idaho Power Co.,* 344 U.S. 17, 19–21, 73 S.Ct. 85, 87 [97 L.Ed. 15] (1952); *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 145, 60 S.Ct. 437, 442 [84 L.Ed. 656] (1940); *Pistorio v. Zoning Bd. of Howard County,* 268 Md. 558, 567–70, 302 A.2d 614, 619 (1973); *Montgomery v. Board of County Comm'rs for Prince George's County,* 256 Md. 597, 604, 261 A.2d 447, 450–51 (1970); *Board of County Comm'rs for Prince George's County v. Brown,* 253 Md. 632, 639–42, 253 A.2d 883, 888–89 (1969); . . . . Of course, the court need not remand if the modification is so minor as to make remand inappropriate. *Idaho Power Co.,* 344 U.S. at 20, 73 S.Ct. at 87; *Board of County Comm'rs for Prince George's County v. Meltzer,* 239 Md. 144, 156–57, 210 A.2d 505, 512 (1965), or if remand is otherwise futile. *Hooper v. Mayor of Gaithersburg,* 270 Md. 628, 637, 313 A.2d 491, 496 (1974); *Chevy Chase Village v. Montgomery County Council,* 258 Md. 27, 40, 44, 264 A.2d 861, 867–68, 869–70 (1970); *Williams v. Washington Metropolitan Area Transit Comm'n,* 415 F.2d 922, 939–43 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860 [21 L.Ed.2d 773] (1969). Finally, if an administrative function remains to be performed, a reviewing court may not modify the administrative agency's action even when a statute provides that the court may

'affirm, modify or set aside' because a court may not usurp administrative functions. *Food Employees Local 347*, 417 U.S. at 3, 94 S.Ct. at 2077; *Idaho Power Co.*, 344 U.S. at 21, 73 S.Ct. at 87; *Pottsville Broadcasting Co.*, 309 U.S. at 144, 60 S.Ct. at 442; *Federal Radio Comm'n v. General Electric Co.*, 281 U.S. 464, 467, 50 S.Ct. 389, 390 [74 L.Ed. 969] (1930)."

The order of the circuit court, substituting the Postal Service Agreement for the Division's final order, exceeded the court's statutory authority and usurped administrative functions. It must, therefore, be reversed.

### B.

■ Generally, in reviewing agency action under the Administrative Procedure Act, a court may only consider the record made before the administrative agency. *E.g., Cicala v. Disability Review Bd.*, 288 Md. 254, 260, 418 A.2d 205 (1980); *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 316–317, 289 A.2d 303, 310 (1972).

There are, however, two narrow exceptions to this general rule. First, under the Administrative Procedure Act, Code (1957, 1982 Repl. Vol.), Art. 41, § 255(d), if

> "it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken *before the agency* upon such conditions as the court deems proper." (Emphasis added.)

Second, "[i]n cases of alleged irregularities in procedure before the agency, not shown in the record, testimony thereon may be taken in the court." § 255(e).[5]

■ The first exception only permits the court to order that additional evidence be taken *before the agency*. It does not permit the court to receive the evidence itself. *See*

---

5. The current version of these provisions is codified in § 10–215(e) and (f) of the State Government Article.

*Breedon v. Maryland Department of Educ.*, 45 Md.App. 73, 86–87, 411 A.2d 1073 (1980). Accordingly, the only evidence beyond the administrative record which may properly be received by the reviewing court is that encompassed by the second exception, *i.e.*, evidence of alleged procedural irregularities.

■ The evidence admitted by the circuit court was as follows: testimony and exhibits as to the market share of the Company and the amount of business it does in Maryland, examples of similar advertising by competitors, evidence about its agreement with the United States Postal Service and efforts to comply with it, and evidence of customer satisfaction with its product. None of this evidence related to procedural irregularities in the instant administrative proceedings. Some of this evidence related to the Company's claim of selective enforcement. While selective enforcement may or may not be a defense on the merits, it is not a procedural irregularity. In addition, the Company had already submitted some evidence on this issue at the administrative level, with its exceptions to the proposed order. None of the additional evidence admitted by the circuit court related to alleged irregularities in procedure before the agency and, therefore, the court erred in admitting it.

### III.

Consumer Publishing sets forth a multitude of grounds for upholding the circuit court's reversal of the administrative decision. First, the Company advances four arguments designed to show that the initial filing of the administrative proceeding was legally improper or that the administrative proceeding should have been dismissed.

### A.

■ Consumer Publishing argues that "[t]he Division improperly targeted the Company for Selective Enforcement

proceeding[s]" (Company's brief, p. 28). More specifically, the Company states:

"The record conclusively establishes that 1) the company is only one of many competing companies marketing similar products, 2) the advertising disseminated by other competitors is substantially similar to that previously used by the company and 3) the Division has taken no action formal or informal, to proceed against or even investigate any other competitor in the industry. (*Id.* at pp. 28–29).

The Company seems to argue that these facts, if proven, would amount to a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Several companies market PPA diet pills in Maryland, and Consumer Publishing included examples of the advertising of some of these companies with its exceptions to the hearing officer's proposed order. These advertisements showed only that some of Consumer Publishing's competitors made advertising claims which were similar to those condemned by the Division in this proceeding. Assuming *arguendo* that the Company did establish that substantially similar claims had been made by many other companies marketing PPA diet pills in Maryland and that the Division had not proceeded against those other companies, the Company's equal protection argument is nevertheless without merit.

The Supreme Court has held that the conscious exercise of some selectivity in enforcing a statute fair on its face does not in and of itself amount to a constitutional violation. *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962); *Snowden v. Hughes*, 321 U.S. 1, 8–10, 64 S.Ct. 397, 88 L.Ed. 497 (1944). In order to establish a violation of the Fourteenth Amendment's Equal Protection Clause, the Company must prove that the Division's selective enforcement "was deliberately based upon an unjustifiable standard or arbitrary classification." *In re Laurence T.*, 285 Md. 621, 628, 403 A.2d 1256 (1979). *See Giant of*

*Md. v. State's Attorney,* 267 Md. 501, 298 A.2d 427, *appeal dismissed,* 412 U.S. 915, 93 S.Ct. 2733, 37 L.Ed.2d 141 (1973); *Drews v. State,* 236 Md. 349, 204 A.2d 64 (1964), *appeal dismissed,* 381 U.S. 421, 85 S.Ct. 1576, 14 L.Ed.2d 693 (1965). The Company has failed to meet this standard.

Although the Division has conceded that Consumer Publishing was the only firm selling "PPA" diet pills which was proceeded against, the Company has not shown that the Division *deliberately* chose not to prosecute other firms in the industry.

As the United States Court of Appeals for the Second Circuit said in *Ger-Ro-Mar, Inc. v. F.T.C.,* 518 F.2d 33, 35 (2d Cir.1975), an enforcement agency "cannot be expected to bring simultaneous proceedings against all of those engaged in identical practices." To require the Division to undertake an industry-wide investigation every time one violator comes to its attention would prevent the prosecution of numerous known violators. It is surely rational for an agency to target resources against one violator and rely on the success of that action to induce voluntary compliance or ease subsequent enforcement against others. The Division represented to the circuit court that affirmance of the administrative order in this case would put other companies selling diet pills "on notice of the standard [for advertising] that has been approved ... and hopefully [they] would come into compliance." The Division further stated that "if, unfortunately some would not voluntarily comply ... we would take action against them ... [in court] ... and attempt to seek civil penalties ...." The Company has produced no evidence that the Division has intentionally and purposefully decided to prosecute only Consumer Publishing and not to prosecute other industry violators.

Furthermore, the Company has not shown that the Division's enforcement was based on an unjustifiable standard

or arbitrary classification.[6] The Division represented that Consumer Publishing came to its attention because it ranks second in national market share among mail order companies selling PPA products and was taking out full-page advertisements in Maryland newspapers. The Company submitted no evidence at the administrative proceeding to the contrary. Consequently, the Company has not met its burden of showing deliberate discrimination based on an unjustifiable standard or arbitrary classification. Its selective enforcement argument is without merit.

## B.

Consumer Publishing also contends that the Division was required to proceed by rulemaking rather than by adjudication. The Company claims that the allegedly deceptive advertising practices complained of are industry-wide practices. The Company's position appears to be that, when attacking an industry-wide practice, the Division is making policy and should proceed by rulemaking.

The administrative record does not establish that the allegedly deceptive advertising practices engaged in by the Company are industry-wide practices. Moreover, even if the Company had proven an industry-wide practice, the Division would not have been required to proceed by rulemaking.

Courts have generally held that administrative agencies "[are] not precluded from announcing new principles in ... adjudicative proceeding[s] and that the choice between rulemaking and adjudication lies in the first instance within the

---

**6.** Constitutional violations have been found when individuals were singled out because of their race, sex, or organizational membership, or in retaliation when they exercised constitutional or statutory rights. *See* 2 Davis, *Administrative Law Treatise*, § 9.7 (2d ed. 1979 & 1982 Supp.). *See also* B.L. Gershman, Prosecutorial Misconduct § 4.3 (1985). In the *Laurence T.* case, this Court found a constitutional violation when the State admitted to prosecuting a juvenile offender because his mother did not promise to make restitution and not prosecuting other offenders because their parents had made such promises. 285 Md. at 628–629, 403 A.2d 1256.

[agency's] discretion." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974). *Accord, e.g., NAACP v. FPC,* 425 U.S. 662, 668, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); *SEC v. Chenery Corp.,* 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580–1581, 91 L.Ed. 1995 (1947); *Cities of Anaheim, Riverside, Bunning, etc. v. FERC,* 723 F.2d 656, 659 (9th Cir.1984); *Belland v. Pension Ben. Guar. Corp.,* 726 F.2d 839, 845 (D.C.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984); *Florida Power and Light v. FERC,* 617 F.2d 809, 816 (D.C.Cir.1980); *Mehta v. INS,* 574 F.2d 701, 705 (2d Cir.1978); *Chocknok v. State, Commercial Fish. Entry,* 696 P.2d 669, 676 n. 10 (Alaska 1985); *Young Plumbing and Heating Co. v. Iowa, etc.,* 276 N.W.2d 377, 382 (Iowa 1979); *West Bridgewater Police v. Labor Rel. Com'n.,* 18 Mass.App. 550, 468 N.E.2d 659, 662 (Mass.App.Ct.1984); *Bunge Corp. v. Commissioner of Revenue,* 305 N.W.2d 779 (Minn.1981); *Occidental Chem. v. N.Y. State Envir. Fuel,* 125 Misc.2d 1046, 480 N.Y.S.2d 838, 841 (N.Y.Sup.Ct.1984); *Mollinedo v. Texas Employment Commission,* 662 S.W.2d 732, 738 (Tex.App. 1983).

As Justice Murphy said for the Court in *SEC v. Chenery Corp., supra,* 332 U.S. at 202–203, 67 S.Ct. at 1580–81:

"The function of filling in the interstices of the Act should be performed, as much as possible, through the quasi-legislative promulgation of rules to be applied in the future. But any rigid requirement to that effect would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise .... Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule.

\* \* \* \* \* \*

[T]he agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by

individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."

For these reasons most courts have allowed agencies broad discretion in choosing whether to develop policy by rulemaking or adjudication.

A few cases, however, have taken a more restrictive view, requiring agencies to proceed by rulemaking under certain circumstances. *Ford Motor Co. v. F.T.C.,* 673 F.2d 1008, 1009 (9th Cir.1981), *cert. denied,* 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1983); *Cities of Anaheim, Riverside and Banning, etc. v. FERC,* 723 F.2d 656, 659 (9th Cir.1984) (limiting, however, the *Ford Motor Co.* case); *Metromedia, Inc. v. Dir. Div. of Taxation,* 97 N.J. 313, 478 A.2d 742, 749–755 (1984). *See Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *NLRB v. Majestic Weaving Co.,* 355 F.2d 854, 859–861 (2d Cir.1966) (dictum). The most restrictive view is expressed in *Ford Motor Co. v. F.T.C.,* 673 F.2d at 1009, relied on by Consumer Publishing, where the United States Court of Appeals for the Ninth Circuit stated that "an agency must proceed by rulemaking if it seeks to change the law and establish rules of widespread application." [7]

This Court has not addressed the question of when, if ever, an agency is required to proceed by rulemaking. Nonetheless, in the instant case it was clearly appropriate

---

**7.** Professor Davis rejects this view as directly contrary to *Chenery* and *Bell Aerospace.* 2 Davis, *Administrative Law Treatise,* § 7.25 at 181–182 (1982 Supp.). He does suggest, however, that there may be cases in which an agency should be required to use rulemaking procedure. Davis enumerates several factors which either separately or in combination, could make rulemaking particularly desirable (*Davis* at 186):

"[1] abrupt change in established law, ... as distinguished from making law where none existed before; [2] the degree of unfairness of retroactive application of the changed law in the particular circumstances; [3] the justifiable reliance by the objecting party on the previous law; [4] the possible unfairness to nonparties who are denied the opportunity to influence the lawmaking that drastically affects them; and [5] the unexpectedness of the change."

For a discussion of the limits, if any, on agency discretion in this area, *see generally* Davis, § 7.25 (1979 & 1982 Supp.).

for the Division to proceed by adjudication, even under the restrictive view expressed in *Ford Motor Co. v. F.T.C.*, *supra.* The Consumer Protection Division did not change existing law or even formulate rules of widespread application in this proceeding. The hearing officer and the Chief of the Division simply applied the statutory standards to the facts in the record.[8] We therefore hold that the Division was not required to proceed by rulemaking in this case.

## C.

Consumer Publishing maintains that the Division lacked authority to initiate an administrative cease and desist order hearing, pursuant to § 13–403 of the Commercial Law Article, in the absence of a consumer complaint. While conceding that the Division has authority under § 13–204(2) to initiate its own investigation of a possibly unfair or deceptive trade practice, the Company asserts that, when there is no consumer complaint, the Division must proceed by seeking an injunction, civil penalties or criminal penalties in

---

**8.** The Division found that Consumer Publishing had violated §§ 13–301(1), (2), (3), and (9)(i) of the Commercial Law Article, Maryland Code (1975, 1983 Repl.Vol.). These provisions are as follows:

"Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

\*　\*　\*　\*　\*　\*

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\*　\*　\*　\*　\*　\*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service; ...."

circuit court (*see* §§ 13–406, 13–410 and 13–411), rather than by an administrative cease and desist order hearing.

Section 13–403(a)(1) flatly provides that "the Division may hold a public hearing to determine if a violation of the title has occurred." [9] Nothing in the statutory language re-

9. The full text of § 13–403 is as follows:

"(a) *Hearing.*—(1) The Division may hold a public hearing to determine if a violation of this title has occurred.

(2) The Division shall serve:

(i) A statement of charges on the alleged violator; and

(ii) A notice of the time and place of hearing on each party of record.

(3) The Division shall hold the hearing not less than ten days after service of the statement of charges. Each party of record may appear before the Division in person or, at his option, by his authorized representative and may have the assistance of an attorney. The parties may present evidence and cross-examine witnesses. All testimony shall be given under oath and may be required by the issuance of a subpoena signed by the Division. Irrelevant, unduly repetitious, or protracted evidence may not be admitted. Hearings may be limited by the Division if the Division so notifies each party before the hearing.

(4) The Division shall keep a full record of the hearing. The record shall be open to inspection by any person. On request of an interested party to the proceeding, the Division shall furnish the party a copy of the hearing record at a cost which the Division considers appropriate.

(b) *Findings and order.*—(1) If, at the conclusion of the hearing, the Division determines on the preponderance of evidence that the alleged violator violated this title, the Division shall state its findings and issue an order requiring the violator to cease and desist from the violation and to take affirmative action, including the restitution of money or property. The order shall contain a notice which states that if the Division determines that the violator has not corrected the violation and complied with the order within 30 days following service of the order, the Division shall proceed with enforcement pursuant to this subtitle.

(2) If, at the conclusion of the hearing, the Division determines on the preponderance of evidence that the alleged violator did not violate this title, the Division shall state its findings and issue an order dismissing the complaint.

(c) *Civil action.*—(1) If, at any time after a complaint has been filed, the Division believes that an appropriate civil action to preserve the status quo or prevent irreparable harm is advisable, it may file an action in court, including an action which seeks a temporary restraining order or preliminary injunction.

(2) To obtain compliance with its order, the Division may institute a civil proceeding, including a proceeding which seeks a re-

quires that a consumer complaint have been filed before the Division may hold a hearing. If the Legislature intended to limit the Division's authority as argued by the Company, it likely would have done so expressly.[10]

The Company points out that §§ 13–403(b)(2) and 13–403(c)(1) refer to a "complaint." Section 13–403(c)(1) states that the Division may file an action in court to preserve the status quo "at any time after a complaint has been filed." Section 13–403(b)(2) states that if the Division determines that the alleged violator did not violate the Consumer Protection Act, it shall "issue an order dismissing the complaint." First, the term "complaint" reasonably encompasses both a consumer complaint and a complaint filed by the Division itself. Second, the language referred to is not part of the grant of authority in § 13–403(a)(1) and is not otherwise set forth as a limitation.

In addition, policy considerations support an interpretation of the statute which allows the Division to hold cease and desist order hearings on its own initiative. In many instances consumers may be unaware of protections and remedies afforded by the Consumer Protection Act. Moreover, the amount of money involved in a single transaction might be sufficiently low that consumers would not find it worthwhile to file formal complaints with the Attorney General.

■ Finally, we note that the Consumer Protection Division has consistently interpreted the statute as allowing it to hold cease and desist order hearings in the absence of consumer complaints. The statutes authorizing the Division to hold cease and desist order hearings were originally enacted in 1974. Ch. 609, § 4, of the Acts of 1974. In 1975 the Division promulgated regulations entitled "Rules of

straining order and a temporary or permanent injunction. (An. Code 1957, art. 83, § 20G; 1975, ch. 49, § 3.)

**10.** Section 13–105 provides that Title 13 "shall be construed and applied liberally to promote its purpose."

Practice and Procedure—Cease and Desist Order Hearings." These regulations expressly provide that the Division itself may serve as the "party proponent," with the obligation to show probable cause to believe that a violation of the Consumer Protection laws has occurred. COMAR 02.01.02.14. The regulations also provide that when the Division itself "acts as the party proponent, the Attorney General shall appoint a special hearing officer to conduct the proceedings who has had no prior contact or information with respect to the proceedings." *Ibid.* The regulations clearly contemplate that the Division may initiate cease and desist order hearings when there is no consumer complaint. The consistent construction of a statute by the agency responsible for administering it is entitled to considerable weight. *Comm'n on Human Rel. v. Mass Transit,* 294 Md. 225, 233, 449 A.2d 385 (1982); *National Asphalt v. Prince Geo's Co.,* 292 Md. 75, 80, 437 A.2d 651 (1981); *Balto. Bldg & Constr. Trades v. Barnes,* 290 Md. 9, 14–15, 477 A.2d 979 (1981); *Holy Cross Hosp. v. Health Services,* 283 Md. 677, 685, 393 A.2d 181 (1978).

■ Accordingly, we hold that the Division has authority, under § 13–403 of the Commercial Law Article, to conduct a cease and desist order hearing in the absence of consumer complaints.

### D.

■ The Company contends that the Division was without authority to initiate cease and desist order proceedings against it because "[s]ix weeks prior to the filing of the charges ..., the Company entered into a valid, binding and enforceable Compromise Agreement with the [United States Postal Service] covering the precise practices complained of by the Division." (Company's brief, pp. 20–21). In making this argument, the Company relies entirely on language in *John C. Winston Co. v. FTC,* 3 F.2d 961 (3d Cir.), *cert. denied,* 269 U.S. 555, 46 S.Ct. 19, 70 L.Ed. 409 (1925), where the court stated (3 F.2d at 962):

"It will be enough to say that the evidence shows that the Company itself had ceased and desisted from the practices before the Commission filed the complaint, and on this evidence the order of the Commission to cease and desist from doing what the company had already ceased and desisted from doing—and what it offered to stipulate to never do again—cannot be sustained."

The Company argues that if the Federal Trade Commission may not issue cease and desist orders directed against practices which have been voluntarily discontinued, then the Division certainly may not issue such an order against Consumer Publishing when it is already legally bound to discontinue the practices complained of.

In cases after *John C. Winston Co. v. FTC, supra,* the courts have consistently held that "at least where a discontinued deceptive trade practice could be resumed, the prior practice may be the subject of a cease and desist order." *Beneficial Corp. v. F.T.C.,* 542 F.2d 611, 617 (3d Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). *Accord Lee v. F.T.C.,* 679 F.2d 905 (D.C.Cir.1980); *F.T.C. v. Gibson Products,* 569 F.2d 900 (5th Cir.1978); *Feil v. F.T.C.,* 285 F.2d 879 (9th Cir.1960). Although some cases involving Federal Trade Commission decisions have stated that there is an outer limit to the Commission's discretion to issue orders with respect to discontinued trade practices, these cases involved practices which had been discontinued long before the Commission's complaint was filed. *See, e.g., Rodale Press, Inc. v. F.T.C.,* 407 F.2d 1252 (D.C.Cir. 1968) (four years). In the instant case, the Division filed charges on May 18, 1981. At that time, the most recent advertisement had run on March 22, 1981.

Nevertheless, the Company insists that the Division should not have filed charges because the compromise agreement with the United States Postal Service, entered on April 9, 1981, covered the practices complained of by the Division and legally bound the Company to discontinue such practices. The compromise agreement, however, differs from the Division's final order in several important re-

spects. It does not cover all of the representations prohibited in the Division's final order. In particular, the compromise agreement does not forbid representations that the Company's pills "will prevent hunger or end the cause of hunger or excessive consumption of food," that use of the pills or the diet plan "will result in a significant weight loss for substantially all users," or that users of the pills or plan have experienced "certain amounts of weight loss or inches lost ... without indicating what weight loss or inches lost the typical prospective purchaser experiences ... with the kind of supervision that typical prospective purchasers will receive." Also, as the Company concedes, the agreement does not require that the Company's advertising include the bold-faced disclosure "DIETING IS REQUIRED," or disclosure of the active ingredients in the pills.

Because the compromise agreement does not cover all of the practices complained of and the remedies sought by the Division, the Company's argument that the existence of that agreement barred this proceeding is untenable.[11]

### IV.

The Company also argues that the Consumer Protection Division's combination of prosecutorial and adjudicatory functions, along with four alleged procedural irregularities, "when viewed collectively" rise to the level of a violation of the Company's federal constitutional right to due process of law.

### A.

A leading case on whether due process requires a separation of functions in administrative proceedings is *Withrow*

---

11. Even if the agreement did cover the practices complained of and the remedies sought by the Division, the existence of the agreement would not necessarily bar the Division from proceeding. The Legislature's purpose in enacting the Consumer Protection Act was to supplement existing federal and state laws which it found to be "inadequate, poorly coordinated and not widely known or adequately enforced." § 13–102(a)(2).

*v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). In that case, a Wisconsin board heard testimony about Dr. Larkin in an investigative hearing and then sent him a notice of "a contested hearing" to determine whether his license to practice medicine should be suspended. The Supreme Court held that the Board was not disqualified to hold the contested hearing or to make the decision, stating (421 U.S. at 47, 95 S.Ct. at 1464):

"The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in an administrative adjudication ... must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."

The Court found no support for "the bald proposition ... that agency members who participate in an investigation are disqualified from adjudicating," and said that "[t]he incredible variety of administrative mechanisms in this country will not yield to any single organizing principle." *Id.* at 52, 95 S.Ct. at 1467. More specifically the Court held (*id.* at 56, 95 S.Ct. at 1469):

"It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law."

*See Marcello v. Bonds,* 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed.2d 1107 (1955); *F.T.C. v. Cinderella Career and Finishing Schools,* 404 F.2d 1308, 1315 (D.C.Cir.1968). *See generally,* 3 K. Davis, *Administrative Law Treatise* §§ 18.3, 18.8 (2d ed. 1980).

In the present case, the actions of the Consumer Protection Division of the Attorney General's Office fall well within the range of acceptable combinations of functions set forth in *Withrow v. Larkin, supra.* The Division investigated Consumer Publishing's advertising practices, filed charges based on the results of the investigation and held hearings to determine whether the Company had violated the Consumer Protection Act. While the Attorney General clearly received the results of the investigation and approved the filing of charges, the record indicates that he did not participate in the adjudicatory process, either at the initial hearing or at the later hearing on exceptions. The hearing officer and the Chief of the Division, who did exercise adjudicatory functions, did not participate in the investigation. The combination of functions in the Attorney General's office, in itself, is clearly not a violation of due process of law.

Nevertheless, the Company relies on the following language in *Withrow v. Larkin, supra,* 421 U.S. at 58, 95 S.Ct. at 1470:

"That the combination of investigative and adjudicative functions does not, without more, constitute a due process violation, does not ... preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high."

The Company asserts that such special circumstances are present in the instant case. As previously mentioned, the Company argues that there were four procedural irregularities which, when viewed together and coupled with the combination of functions, amount to a violation of the Fourteenth Amendment's Due Process Clause.

### B.

The first alleged procedural irregularity was the issuance of a press release by the Attorney General on May 20, 1981, the same day charges were filed against the Company. The Company contends that the release was "inflammatory"

and revealed "a clear prejudgment by the Attorney General himself that the Company was guilty of the charges alleged ...." (Company's brief, pp. 32–33.)

Courts have repeatedly held that the issuance of press releases announcing charges by the agency that will ultimately decide the case does not violate due process guarantees. *See, e.g., Roberts v. Morton*, 549 F.2d 158, 164 (10th Cir.1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977); *F.T.C. v. Cinderella Career and Finishing Schools, Inc.*, 404 F.2d 1308 (D.C.Cir.1968); *Bowman v. U.S.D.A.*, 363 F.2d 81 (5th Cir.1966). *See* Lemov, *Administrative Agency News Releases: Public Information vs. Private Injury*, 37 Geo.Wash.L.Rev. 63 (1968). In the *Cinderella* case, *supra*, the school argued that the issuance of news releases prior to final adjudication constituted or gave the appearance of prejudgment of the issues. The school asserted that, in the event of ultimate adjudication in its favor, the damage through the news releases would be beyond repair or remedy. The United States Court of Appeals for the District of Columbia Circuit recognized that "a press release of the kind ... involved results in a substantial tarnishing of the name, reputation and status of the named respondent." 404 F.2d at 1313. Nonetheless, the Court found that the F.T.C. was acting within its authority and had not violated the school's due process rights, reasoning (*id.* at 1314):

"The press releases predicated upon official action of the Commission constitute a warning or caution to the public, the welfare of which the Commission is in these matters charged. We note that there is no contention in this case that the allegations in the Commission's complaint were knowingly false.

\* \* \* \* \* \*

"If the unsophisticated consumer is to be protected in any measure from deceptive or unfair practices, it is essential that he be informed in some manner as to the identity of those most likely to prey upon him utilizing such prohibited conduct. Certainly advice through news

media as to the actions being taken by a government agency in his behalf constitutes a prophylactic step addressed ultimately to the elimination of the conduct prohibited by the statute."

*See* Lemov, *Administrative Agency News Releases, supra,* at 75–77.

 The Consumer Protection Division and the Attorney General of Maryland, like the F.T.C., clearly have a mandate "to protect the consumer" from "deceptive practices." § 13–102 of the Commercial Law Article. In addition, the General Assembly has provided that the Attorney General is empowered to "use the funds and employ the media which he considers necessary to ... educate the public as to nefarious schemes which might be foisted on the public" § 13–203(4). *Compare* 15 U.S.C. § 46(f) (granting power to the F.T.C. to publicize certain information). In order to protect and warn consumers, the Attorney General is clearly authorized to issue a press release at the time charges are filed against an alleged violator. *See* COMAR 02.01.02.-12.[12]

 Furthermore, the press release issued in the instant case did not give the impression that the Attorney General had "prejudged" the facts. The press release set forth the charges against the Company and stated that a hearing officer will decide whether the Company violated the Consumer Protection Act.

Even assuming *arguendo* that the press release did demonstrate some prejudgment by the Attorney General, this would not necessarily have been a violation of due process.

---

**12.** We note, however, that commentators have suggested that agencies should exercise discretion, and set up guidelines for the form and content of press releases which balance the need to inform the public and the need to avoid unnecessary harm to individual companies which may later be found innocent of any wrongdoing. Gellhorn, *Adverse Publicity By Administrative Agencies,* 86 Harv.L.Rev. 1380 (1973). *See* Lemov, *supra;* N. *Sims Organ & Co. v. S.E.C.,* 293 F.2d 78, 81 (2d Cir.1961), *cert. denied,* 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962).

*See Shaughnessy v. United States,* 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed.2d 1074 (1955); *Roberts v. Morton, supra,* 549 F.2d at 164.[13] Evidence of actual bias which offends due process consists of "[s]tatements on the merits by those who must make factual determinations on contested fact issues ... where the fact finding is critical." *Staton v. Mayes,* 552 F.2d 908, 914 (10th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977). Several cases have found due process violations where the evidence showed that the actual decision maker had prejudged the facts of the case. *Cinderella Career and Finishing Schools, Inc. v. F.T.C.,* 425 F.2d 583 (D.C.Cir.1970); *American Cyanamid Co. v. F.T.C.,* 363 F.2d 757 (6th Cir.1966); *Trans World Airlines v. C.A.B.,* 254 F.2d 90 (D.C.Cir.1958). As previously discussed, the Attorney General was not the actual decision maker in this case, and there was no evidence that the hearing officer or the Chief of the Division were in any way pressured by the Attorney General or by anyone else responsible for prosecuting the case, or that they had any *ex parte* contracts regarding the case.[14]

There is no basis in this record for concluding that the Attorney General's press release, either alone or in combi-

---

**13.** In *Shaughnessy* a deportation decision by a Board appointed by the Attorney General was challenged as unfairly prejudged because the alien deported had been "targeted" by the Attorney General for a special deportation program. The Supreme Court refused to speculate as to whether the Attorney General's interest in the program might have exerted "subconscious psychological pressures" on his subordinates. 349 U.S. at 281, 75 S.Ct. at 746–47.

In *Roberts,* the Secretary of the Interior had issued several news releases stating that the Department of the Interior had "wiped out" more than 5,000 mining claims. The Tenth Circuit held that the issuance of the news releases did not taint the hearing officer's decision that the unpatented claims were invalid because the hearing officer had nothing to do with the news release. 549 F.2d at 164.

**14.** In fact the hearing officer and the Chief of the Division both made statements to the contrary in their written decisions in this case. The Division Chief specifically stated that "the quotations attributed to [the Attorney General in the news release] have had no influence whatsoever on this decision."

nation with other factors, violated the Company's due process rights.

## C.

■ The second asserted procedural irregularity concerns § 13–402(a)(1) of the Commercial Law Article, which provides: "If the Division determines that there are reasonable grounds to believe that a violation has occurred, it shall ... attempt to conciliate the matter by methods of conference and persuasion with all interested parties ...." Consumer Publishing contends that the Division violated § 13–402 because it did not make a good faith effort to conciliate.

The conciliation provision of the Consumer Protection Act was first enacted in 1974. Ch. 609, § 4 of the Acts of 1974. That provision was initially codified in Code (1957, 1975 Repl. Vol.), Art. 83, § 20F(b). The text of § 20F(a) and (b), as enacted and immediately prior to recodification in 1975, was as follows:

"(a) Any consumer subjected to an unlawful trade practice as set forth in § 20D of this subheading may file a complaint in writing stating the name and address of the person alleged to have committed the violation complained of and its particulars, and any other information as may be required by the division.

(b) Upon the filing of a complaint, the division shall make an investigation as he deems appropriate to ascertain facts and issues. In making these investigations and determinations he may use the authority granted to the Department in § 20C of this subheading. If appropriate, the division shall refer a complaint to the Federal Trade Commission. *If the division determines that there are reasonable grounds to believe a violation has occurred, it shall attempt to conciliate the matter by methods of initial conference and persuasion with all interested parties and their representatives chosen to assist them.*" (Emphasis added).

As originally enacted, the conciliation provision was part of a statutory subsection which dealt with the investigation of complaints filed by consumers. In this context, the provision applied only to cases involving consumer complaints. *See Devine Seafood, Inc. v. Attorney General*, 37 Md.App. 439, 444–448, 377 A.2d 1194 (1977), *cert. dismissed*, 282 Md. 482, 385 A.2d 85 (1978).

In 1975, the Consumer Protection Act was recodified and became part of the new Commercial Law Article. The provisions dealing with consumer complaints and conciliation were separated and placed in different sections, but the language of the conciliation provision was left virtually unchanged.

As Judge Smith recently pointed out for the Court in *In re Special Investigation No. 236*, 295 Md. 573, 576–577, 458 A.2d 75 (1983),

"[r]ecodification of statutes is presumed to be for the purpose of clarity rather than change of meaning. Thus, even à change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so material that the intention of the General Assembly to modify the law appears unmistakably from the language of the Code."

*See Office & Prof. Employees Int'l. v. MTA*, 295 Md. 88, 100, 453 A.2d 1191, 1197 (1982); *Hoffman v. Key Fed. Sav. & Loan*, 286 Md. 28, 37, 416 A.2d 1265 (1979); *Bureau of Mines v. George's Creek*, 272 Md. 143, 155, 321 A.2d 748 (1974). Accordingly, we hold that the Division is not required to attempt to conciliate cases which the Division itself has initiated.[15]

---

**15.** Even if an attempt to conciliate were required, it would appear that the Division did attempt conciliation in the instant case. The Company admits there was a conciliation conference but asserts that no good faith effort at compromise was made. The Company did not, however, produce sufficient evidence to establish that, at the conference, the Division failed to negotiate in good faith.

## D.

■■■ Consumer Publishing also complains that the Division's regulations were violated when Mr. Erwin, the Chief of the Consumer Protection Division, appointed Charles Shafer as the hearing officer in this matter. The Division's regulations provide that "when the Consumer Protection Division acts as the party proponent, the Attorney General shall appoint a special hearing officer to conduct the proceedings who has had no prior contact or information with respect to the proceedings." COMAR 02.01.02.14D. The Company does not dispute that Shafer, a professor at the University of Baltimore School of Law, had had no prior contact or information regarding these proceedings. Instead, the Company objects to the fact that Mr. Erwin, as Chief of the Division, appointed Shafer, and it contends that the regulation required that the Attorney General personally make the appointment.

The Constitution, statutes and regulations impose many duties on the Attorney General. Obviously, the Attorney General could not personally perform all of the duties imposed upon him by law. Recognizing this, the General Assembly has explicitly provided that "the Attorney General may assign to [a deputy attorney general, assistant attorney general or special attorney] . . . any of the duties required of him by law." Code (1957, 1976 Repl.Vol., 1982 Cum.Supp.), Art. 32A, § 6.[16]

While in some circumstances the power of appointment may be nondelegable, where, as here, it is simply conferred by regulation, and in light of the above-quoted statute, the Attorney General could delegate to a subordinate the authority to appoint the hearing officer.

## E.

■■■ The Company's final procedural objection is that Mr. Erwin was without authority to issue the final order. In his

---

**16.** The current version is codified in Code (1984), § 6–105(e)(1) of the State Government Article.

capacity as Chief of the Consumer Protection Division, Mr. Erwin heard arguments on the Company's exceptions to the proposed findings of fact, conclusions of law and proposed order of the hearing officer on October 29, 1981. He later retired. On April 8, 1983, the Attorney General appointed Mr. Erwin as "a Special Assistant Attorney General for the limited purpose of signing orders and making final rulings" in the Consumer Publishing case and one other case. On April 13, 1983, Mr. Erwin filed the ruling on the exceptions and the final order in this case.

The Attorney General has the authority to appoint staff, including deputy and assistant attorneys general and special attorneys. Art. V, § 3(b), of the Maryland Constitution; Code (1957, 1976 Repl.Vol., 1982 Cum.Supp.), Art. 32A, § 6.[17] Once specially appointed by the Attorney General, Erwin was again part of the Division for purposes of the issuance of this final order; therefore he had authority to issue the order.

## V.

Consumer Publishing attacks the factual findings underlying the Division's final order on two grounds.

## A.

First, the Company objects that "the findings were reached by the hearing officer on the basis of his own review of the advertisements ... without any supporting testimony from a consumer or consumer expert." (Company's brief, p. 43). The answer to this objection is that the statute specifically provides that "[a]ny practice prohibited by this title is a violation of this title, whether or not any consumer has in fact been misled, deceived, or damaged as a result of that practice." § 13–302 of the Commercial Law Article. In not requiring proof of actual deception or harm

---

17. The current version of the statute is in § 6–105(a) of the State Government Article.

to consumers, the Consumer Protection Act follows the practice of the Federal Trade Commission. *American Home Produces Corp. v. F.T.C.*, 695 F.2d 681, 687 (3d Cir.1982); *Simeon Management Corp. v. F.T.C.*, 579 F.2d 1137, 1146 n. 11 (9th Cir.1978); *Spiegel, Inc. v. F.T.C.*, 494 F.2d 59 (7th Cir.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974). The Federal Trade Commission has consistently analyzed only the advertisements themselves, without requiring testimony by consumers or consumer experts, and the courts have upheld the practice. *See, e.g., FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 391–392, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); *J.B. Williams Co. v. F.T.C.*, 381 F.2d 884, 889–891 (6th Cir.1967). The rationale for this practice is that the Commission has the expertise to determine whether advertisements have the capacity to deceive or mislead the public. *American Home Products, supra*, 695 F.2d at 687 n. 10. In enacting § 13–302, the General Assembly expressed its judgment that the Consumer Protection Division also has the expertise necessary to make that determination without testimony by consumers or consumer experts.

### B.

▆▆ Second, the Company contends that it was error for the Division, in making its findings, to have considered advertisements published before April 9, 1981, the date of the Company's compromise agreement with the United States Postal Service. At the administrative hearing on June 25, 1981, the Division introduced four advertisements which were published between January 7, 1979, and March 22, 1981. The Company claims that it has "eliminated several specific claims and representations challenged by the Division" in advertisements published since the postal agreement, and that, therefore, some of the advertisements which the Division relied on were "irrelevant and of no evidentiary value whatsoever." (Company's brief, pp. 43–44). This argument is without merit.

As discussed in Part III D of this opinion, the compromise agreement did not cover all of the practices complained of and remedies sought by the Division, and the Division was free to proceed against the Company despite the existence of that agreement. Moreover, the most recent advertisement introduced by the Division was published only two months before the Division filed charges. In light of these facts, the advertisements which the Division relied on at the hearing were relevant.

## VI.

▇▇▇ Consumer Publishing contends that the affirmative disclosure provisions of the final administrative order violate its First Amendment rights. The final order provided, *inter alia,* that the Company must:

"1) In all advertising or solicitations, disseminated in the state of Maryland, clearly and conspicuously include the notice 'DIETING IS REQUIRED' in bold-faced type;

"2) Clearly and conspicuously disclose every part of the program, plan, system or product which must be used or followed in order for the user to achieve significant weight loss;

"3) Clearly and conspicuously disclose the active ingredients in any tablets or pills which are sold or recommended as part of the program, plan, system or product;

"and 4) include in any packages sent to Maryland Consumers a separate sheet of paper at least the size of a regulation post card and in type no smaller than pica type, the notice 'IF YOU FEEL THAT THIS PRODUCT DOES NOT LIVE UP TO THE CLAIMS WE HAVE MADE FOR IT IN OUR ADVERTISING, WE WOULD LIKE TO HEAR ABOUT IT. PLEASE NOTIFY US AND THE MARYLAND CONSUMER PROTECTION DIVISION' for two years from the date of this order." [18]

---

**18.** The Division is authorized to include affirmative disclosure provisions in its orders by § 13–403(b) of the Commercial Law Article, which explicitly provides that if

The Supreme Court has held that commercial speech does enjoy some degree of First Amendment protection. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). *See Barnett v. Md. St. Bd. of Dental Ex.*, 293 Md. 361, 366, 444 A.2d 1013 (1982). In so holding, however, the Supreme Court has explicitly stated (*Virginia Pharmacy Board, supra*, 425 U.S. at 771, 96 S.Ct. at 1830):

> "Untruthful speech, commercial or otherwise, has never been protected for it's own sake.... Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a state's dealing effectively with this problem."

The Court went on to note (*id.* at 771 n. 24, 96 S.Ct. at 1830):

> "... the greater objectivity and hardiness of commercial speech ... may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker ... [and] ... may also make it appropriate to require that a commercial message appear in such a form or include such additional information, warnings and disclaimers, as are necessary to prevent its being deceptive."

For these reasons, the Supreme Court has said that misleading or potentially deceptive advertising may be prohibited entirely. *In re R.M.J., supra*, 102 S.Ct. at 937; *Young v. American Mini-Theatres, Inc.*, 427 U.S. 50, 68, 96 S.Ct. 2440, 2451, 49 L.Ed.2d 310 (1976). *See, e.g., Barnett v. Md. St. Bd. of Dental Ex., supra*, 293 Md. at 366–367; *Brock-*

---

"the Division determines on the preponderance of the evidence that the alleged violator violated this title, the Division shall ... issue an order requiring the violator to cease and desist from the violation *and to take affirmative action,* including the restitution of money or property." (Emphasis added).

*lesby v. U.S.*, 753 F.2d 794 (9th Cir.1985). Moreover, the courts have generally upheld affirmative disclosure provisions like those in the present case. *Bristol-Myers Co. v. F.T.C.*, 738 F.2d 554, 562 (2d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 960, 83 L.Ed.2d 1966 (1985); *American Home Products Corp. v. F.T.C.*, 695 F.2d 681, 700–704, 713–714 (3d Cir.1982); *Encyclopaedia Brittanica, Inc. v. F.T.C.*, 605 F.2d 964, 972–973 (7th Cir.1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); *Porter & Dietsch, Inc. v. F.T.C.*, 605 F.2d 294, 304 (7th Cir.1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); *Warner-Lambert Co. v. F.T.C.*, 562 F.2d 749 (D.C. Cir.1977), *cert. denied*, 435 U.S. 950, 98 S.Ct. 1575, 55 L.Ed.2d 800 (1978).

While apparently conceding that the Federal Trade Commission could, consistent with the First Amendment, require affirmative disclosure provisions like those in the instant case, the Company contends that a state agency cannot require the same thing to stop deceptive advertising. The Company thus argues (Company's brief, pp. 49–51):

"While such affirmative disclosure provisions have been approved in decisions rendered by the FTC (in appropriate circumstances) that agency, unlike the Division, possesses national jurisdiction, and its orders may be enforced nationwide. The Division oversteps its bounds in attempting to require such affirmative advertising in national publications simply because they are distributed in the State.... The impropriety of these provisions may be illustrated vividly: If the State of Maryland is permitted to dictate the specific wording of such national advertising, so, too, could 49 other states. If the State of Maryland may require the words 'DIETING IS REQUIRED,' then the Commonwealth of Virginia may require the words 'MUST LOWER CALORIC INTAKE' and the State of Delaware may require the words 'DIETARY RESTRICTIONS ARE REQUIRED' and the State of New York may require the words 'MUST MODIFY EATING HABITS,' etc., through 50 states. The effect, of

course, would be to eliminate the Company's national advertising campaign. The Circuit Court was obviously correct in invalidating those dictatorial and extraterritorial provisions of the administrative order." [19]

This particular constitutional argument is being advanced for the first time in this Court. It was not made at the administrative level, and, therefore, we shall not consider it. In an action to review an administrative decision, a party "may not raise [an issue] for the first time in a judicial review proceeding." *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 518, 390 A.2d 1119 (1978). *See P.G. Doctors' Hosp. v. HSCR Comm'n*, 302 Md. 193, 226, 486 A.2d 744 (1985).

## VII.

The Company argues that the restitution provision of the administrative order must be struck down because there was no evidence that purchasers relied on false impressions created by the Company's advertisements. The Company also argues that the time period covered by the restitution provision is not justified by the evidence in the record. We hold that the Division may enter a general order of restitution without proof of purchaser reliance, as long as the order provides a mechanism for processing individual claims. Nonetheless, we shall vacate the restitution provision of the order because the time period covered is too broad and because the Division's order did not provide a procedure for processing individual consumer claims.

The restitution provision of the Division's order required the Company to restore the initial purchase price, including postage, to all residents of Maryland who purchased the products featured in the advertisements at issue between May 19, 1978, and December 31, 1981. The provision did not include reorders, on the theory that "consumers who decide to re-order ... the [Company's] product do so more

---

**19.** While characterized as a First Amendment argument, the Company's contention appears to be a Commerce Clause contention.

on the basis of their experience in using the product than on any residual impressions remaining from [the Company's] deceptive advertising." The order further provided that the Company "shall make available to the Consumer Protection Division such business records or other documents as will identify Maryland consumers who are entitled to restitution under this Order."

The Consumer Protection Act expressly authorizes the Division to order restitution. In § 13–403(b)(1) of the Commercial Law Article, the statute provides:

> "If, at the conclusion of the hearing, the Division determines on the preponderance of the evidence that the alleged violator violated this title, the Division shall state its findings and issue an order requiring the violator to cease and desist from the violation and to take affirmative action, *including the restitution of money or property.*" (Emphasis added.)

In § 13–402(b)(1), the statute is more specific, stating that: "... any cease and desist order provided for by this subtitle may include a ... condition for ... (ii) the restitution by the violator ... to the consumer of money, property, or any other thing received from the consumer in connection with a violation ... of this title."

Professor Dobbs has contrasted restitution to a damages action, saying (Dobbs, *Law of Remedies* § 4.1 at 224 (1973)):

> "The damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep....
>
> "Restitutionary recoveries often amount to about the same as the plaintiff's losses, and thus serve many of the compensatory purposes served by a damages recovery. The justification lies, however, in the avoidance of unjust enrichment on the part of the defendant."

*See Prosser & Keeton on Torts* § 105 at 730–731 (5th ed. 1984).

█ Traditionally, to be entitled to restitution because of misrepresentation, the plaintiff must prove reliance on a material misrepresentation. Restatement of Restitution § 9 (1937). *See Chesapeake Homes v. McGrath,* 249 Md. 480, 488, 240 A.2d 245, 249 (1968); *Milkton v. French,* 159 Md. 126, 131, 150 A. 28 (1930); *Reliance Finance Corp. v. Miller,* 557 F.2d 674, 680 (9th Cir.1977); *Cousineau v. Walker,* 613 P.2d 608, 611–612 (Alaska 1980); Wade & Kamenshine, *Restitution for Defrauded Consumers: Making the Remedy Effective Through Suit By Governmental Agency,* 37 Geo.Wash.L.Rev. 1031, 1037–1038 (1969).

Moreover, the plaintiff is generally required to disaffirm the contract and restore what he received under the bargain, or at least offer in good faith to restore it, before the defendant is required to restore what he received. *Lazorcak v. Feuerstein,* 273 Md. 69, 327 A.2d 477 (1974); *Funger v. Mayor of Somerset,* 244 Md. 141, 223 A.2d 168 (1966); Dobbs, *supra,* § 4.8; Wade & Kamenshine, *supra,* at 1039–1040; *Prosser & Keeton, supra,* § 105 at 730; Restatement of Restitution § 65. This requirement has been relaxed when the thing received by plaintiff is expected to be consumed, or from its very nature cannot be returned, or is worthless. *Lazorcak v. Feuerstein, supra; Funger v. Mayor of Somerset, supra;* Dobbs, *supra,* § 4.8 at 295; Wade & Kamenshine, *supra,* at 1042; Restatement of Restitution § 65(c) and (d).

█ Over the last thirty years, many states have adopted legislation permitting restitution in cases where the state attorney general or a state agency seeks to prohibit deception, deceptive acts and practices, or misrepresentation in connection with the sale or advertisement of any merchandise. Maryland's Consumer Protection Act is one such statute. These statutes empower courts, and in some instances agencies, to issue orders requiring the restoration of money or other property acquired by any of the practices declared unlawful. *See* Wade & Kamenshine, *supra,* at 1059 n. 184 and statutes cited therein.

Professors Wade and Kamenshine have suggested that one purpose of such statutes is facilitating consumer redress, and that this purpose is best served by construing the restitution provisions liberally and minimizing the consumer's burden of proof. With regard to reliance, they state (Wade & Kamenshine, *supra,* at 1061–1062):

"In all cases the consumer probably would have to show at least that his purchase was made at the time of the deceptive practice. And if his burden of proof were further increased by requiring him to present evidence of reliance, the result might be less effective implementation of the statute's goals." [20]

Courts also have recognized that "[l]imitations on the relief available in actions brought by private parties are not necessarily applicable to [public] enforcement proceedings," *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 391 (2d Cir.1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). In *Chris-Craft Industries* the Securities and Exchange Commission had ordered restitution to defrauded shareholders. The company argued that a shareholder who had disposed of the securities received in the company's exchange offer should not recover because he could not restore the *status quo* by tendering the shares to the company. It was argued that since he could not have obtained restitution if he had brought the action himself, the Securities and Exchange Commission could not obtain it for him. The Court rejected this argument stating, *inter alia,* that limitations on private actions did not necessarily apply because the SEC requested resti-

---

**20.** Wade & Kamenshine also discuss the requirement in restitution that plaintiff restore what was received from the defendant. They state that it appears reasonable to require the consumer to return purchased merchandise or to diminish recovery in at least some cases, particularly where the item is of some value. They note, however, that requiring return may impose new burdens on consumers: "For example, where recovery is to be only partial, some estimate of the worth of the product or service would have to be made [introducing] additional problems of proof for the consumer...." Wade & Kamenshine, 37 Geo.Wash.L.Rev. at 1061.

tution "not merely to compensate Piper shareholders for their loss, but also to implement the broader statutory purpose of protecting the public interest through effective enforcement of the securities laws." 480 F.2d at 391.

There are few reported cases discussing whether proof of reliance is necessary to support an award of restitution under state consumer protection statutes. Two California cases involve class actions by consumers seeking restitution under California Business and Professions Code § 17535. In *Fletcher v. Security Pacific Nat. Bank*, 23 Cal.3d 442, 153 Cal.Rptr. 28, 591 P.2d 51 (1979), the court interpreted California's consumer protection law and concluded that the statute authorizing restitution orders does not require proof of reliance. The court said:

> "The general equitable principles underlying section 17535 as well as its express language arm the trial court with cleansing power to order restitution to effect complete justice. Accordingly the statute authorizes a trial court to order restitution in the absence of proof of lack of knowledge in order to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains. 591 P.2d at 55.

> " 'To permit the [retention of] even a portion of the illicit profits would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom.' " 591 P.2d at 57.

In *Committee on Children's T.V. v. General Foods*, 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660 (1983), the court held that the plaintiffs had stated causes of action for injunctive relief and restitution under the false advertising law. Following *Fletcher*, the opinion stated that "[t]he court may ... order restitution without individualized proof of deception, reliance, and injury if it 'determines that such a remedy is necessary to prevent the use or employment of the unfair practice.' " 673 P.2d at 668–669.

In *State ex rel. Kidwell v. Master Distributors*, 101 Idaho 447, 615 P.2d 116 (1980), the Attorney General's Office sought restitution for all purchasers of the company's water conditioners. The trial court, in refusing to order restitution, had held that the Attorney General was required to prove "that consumers in fact relied upon deceptions or misrepresentations," 615 P.2d at 123. The Idaho Supreme Court reversed, holding that restitution was appropriate where such relief was "required to re-establish the *status quo ante* which existed prior to the defendant's deceptive or unfair acts." *Id.* at 124. The Court held, however, that if restitution was ordered on remand, the order must establish a procedure by which consumer claims may be efficiently and fairly processed. *Id.* at 126. *See State v. Ralph Williams' N.W. Chrysler Plymouth*, 87 Wash.2d 298, 553 P.2d 423, 438 (1976), also indicating that "an efficient procedure to allow [defendants] to challenge each consumer claim" was required. *See also State ex rel. Guste v. General Motors Corp.*, 354 So.2d 770, *aff'd* 370 So.2d 477 (La.1978); *State v. Fonk's Mobile Home Park & Sales*, 117 Wis.2d 94, 343 N.W.2d 820, 824 (1983).

In the instant case the Division relies on the following evidence in support of its general order of restitution: First, the Company itself stipulated that the advertisements in evidence were run in Maryland on certain dates. Second, the pills were available only through mail order. Third, the Company has testified to the amount of its Maryland sales during the relevant period. Fourth, the Company has never contended that Maryland consumers purchased the Company's pills in any other way than from the advertisements in evidence. The hearing officer could reasonably infer from this evidence that most Maryland purchasers of Company products saw the deceptive advertisements. It is also reasonable to infer, as the hearing officer did, that the deceptive impressions conveyed by the Company's advertising are material and, if believed, would influence a purchaser's decision to buy. *See F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 392, 85 S.Ct. 1035, 1046, 13 L.Ed.2d 904 (1965).

While there is no direct evidence that any consumers actually relied on the Company's deceptive or misleading advertisements, we do not believe that such evidence is necessary. In accordance with the authorities previously discussed, we believe that the Division may include a general restitution provision in a cease and desist order without direct proof of consumer reliance.

■ Although we reject the Company's broad argument that proof of reliance is necessary before a general restitution order may issue, we do recognize that some of those purchasing the Company's products may not have relied on the false impressions created by the advertisements. Some of these consumers may not want refunds. Accordingly, we believe that the Division's order was defective because it did not provide a procedure for processing individual consumer claims. We agree with the cases in other jurisdictions which, under statutes like Maryland's, require that a restitution order provide a procedure for individual determination of consumer restitution claims. *State ex rel. Kidwell v. Master Distributors, supra; State ex rel. Guste v. General Motors Corp., supra; State v. Ralph Williams' N.W. Chrysler Plymouth, supra.* The Division may not simply require the mailing of refunds to all Maryland consumers who bought Company products during a certain period. Purchasers should be notified that they may obtain a refund; in order to be entitled to such refund, they should be required to state that they relied on the false impressions created by the advertising. In this way, purchasers who were not deceived will not receive an "automatic" refund. It should not be necessary that each purchaser present additional evidence that he was actually deceived and relied on the misrepresentations in the advertisements. To require proof of reliance, beyond the purchaser's statement, would make recovery difficult and complicated.

■ In addition, restitution should not be ordered for the period before January 7, 1979. The deceptive newspaper advertisements covered the period from January 7, 1979, to

March 22, 1981; in addition a similar advertisement was mailed to Maryland consumers on or about October 1, 1981. Restitution was ordered to consumers making purchases between May 19, 1978, and December 31, 1981. Consumers purchasing prior to January 7, 1979, could not possibly have been exposed to the specific advertisements found to be deceptive. Neither the hearing officer nor Mr. Erwin offered any explanation for the May 19th date in the order except that it was three years before the Division filed charges against Consumer Publishing. We therefore hold that the Division erred in ordering restitution for the period from May 19, 1978, to January 6, 1979.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CONSUMER PROTECTION DIVISION FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.*[21]

---

**21.** Our disposition of the Division's appeal renders moot the Company's appeal with regard to expenses, including attorney's fees.