*In the Matter of the Petition of Cricket Wireless, LLC, and AT&T, Inc.*, No. 416, September Term, 2022.  Opinion by Kenney, James A., III, J.

**LIMITATION OF ACTIONS – STATUTES OF LIMITATION – LIMITATIONS APPLICABLE TO PARTICULAR ACTIONS – PENALTIES AND FORFEITURES – IN GENERAL**

One-year statute of limitation set forth in § 5-107 of the Courts and Judicial Proceedings ("CJP") Article of the Maryland Code did not apply in an administrative action brought by the Consumer Protection Division of the Office of the Attorney General ("the Division" or "CPD") against Cricket Wireless, LLC ("Cricket") and AT&T, Inc. (collectively the "Companies"), in which the Division alleged that the Companies had engaged in unfair and deceptive trade practices in violation of the Consumer Protection Act ("CPA").  CJP § 5-107 states that "a prosecution or suit for a fine, penalty, or forfeiture shall be instituted within one year after the offense was committed."  Because CPA action brought by the Division is not a "prosecution" or "suit," CJP § 5-107 does not apply.

**ANTITRUST AND TRADE REGULATION – STATUTORY UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION – PARTICULAR PRACTICES – OMISSIONS AND OTHER FAILURES TO ACT IN GENERAL; DISCLOSURE**

**ANTITRUST AND TRADE REGULATION – ANTITRUST REGULATION IN GENERAL – CARTELS, COMBINATIONS, CONTRACTS, AND CONSPIRACIES IN GENERAL – IN GENERAL**

Circuit court erred in reversing the CPD's determination that the Companies' failure to inform consumers about the plan to shut down a cellular network prior to the Companies' merger in 2015 was a material omission and thus a violation of the CPA.  The Companies' plan to decommission the network was not immaterial as a matter of law, and the CPD's finding of materiality was supported by substantial evidence.

Moreover, the Division's claims were not preempted by federal antitrust law because Cricket's pre-merger conduct was wholly unilateral, and the Companies failed to present any evidence or argument as to how disclosing the plan to shut down the network would have resulted in a restraint of trade or had an anticompetitive effect.  The Division's claims were also not preempted by the prohibition on "gun jumping" because disclosing their plans would not have constituted a collaborative action in furtherance of the merger process.

**ANTITRUST AND TRADE REGULATION – STATUTORY UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION – ENFORCEMENT AND REMEDIES – EVIDENCE – WEIGHT AND SUFFICIENCY**

Circuit court did not err in affirming the CPD's determination that the disclosures regarding the plan to shut down the network, which was implemented following their merger in 2015, were deceptive or misleading. The CPD's decision was reasonable and supported by substantial evidence. Evidence that consumers were actually mislead or deceived by the disclosures was not required.

**ANTITRUST AND TRADE REGULATION – STATUTORY UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION – ENFORCEMENT AND REMEDIES – RELIEF – CEASE AND DESIST ORDERS IN GENERAL**

**INJUNCTION – INJUNCTIONS IN GENERAL; PERMANENT INJUNCTIONS IN GENERAL – FACTORS CONSIDERED IN GENERAL – VOLUNTARY CESSATION OR UNDERTAKING OF CONDUCT**

The circuit court did not err in refusing to reverse the CPD's cease-and-desist order, which, among other things, prohibited the Companies from engaging in any of the practices that led to the CPD's determination that the Companies had violated the CPA. That the Companies steadfastly refused to admit any wrongdoing, and there was no evidence in the record that the Companies would refrain from future acts that involve the same violation or unlawful practice, supported a reasonable expectation that the prohibited actions would recur.

**ANTITRUST AND TRADE REGULATION – STATUTORY UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION – ENFORCEMENT AND REMEDIES – RELIEF – MONETARY RELIEF; DAMAGES – IN GENERAL**

Circuit court erred in reversing the CPD's decision with respect to remedies and remanding the case for an evidentiary hearing on that issue. The CPD followed the requisite statutory procedures in issuing its general order of restitution and in imposing civil penalties against Companies.

Circuit Court for Baltimore City
Case No. 24C21003491

IN THE APPELLATE COURT

OF MARYLAND*

No. 416

September Term, 2022

IN THE MATTER OF THE PETITION OF
CRICKET WIRELESS, LLC, AND AT&T,
INC.

Kehoe,
Leahy,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.

Opinion by Kenney, J.

Filed: September 5, 2023

*Kehoe, J., now retired, participated in the hearing of this case while an active member of this Court, and after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.
*Zic, Terrence, Tang, Rosalyn, and Albright, Anne, JJ. did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland.  The name change took effect on December 14, 2022.

This appeal involves an administrative action initiated in 2020 by the Consumer Protection Division of the Office of the Attorney General ("the Division" or "CPD")[1] against Cricket Wireless, LLC ("Cricket") and AT&T, Inc. (collectively the "Companies"). The Division alleged that, between July 2013 and April 2015, the Companies had engaged in unfair and deceptive trade practices in violation of the Consumer Protection Act ("CPA") by offering cellular phones for sale to Maryland consumers without disclosing that those phones would no longer operate after the Companies' planned decommissioning of Cricket's "CDMA" wireless network following the merger of the Companies in March 2014. Each party filed a motion for summary decision as to the allegations contained in the Division's statement of charges, and the matter was delegated to the Office of Administrative Hearings ("OAH") for the purpose of issuing proposed findings of fact and conclusions of law as to the parties' respective motions. Following a hearing, the OAH issued its proposed findings, and, after the parties filed exceptions to the OAH's proposed findings, the matter was referred back to the CPD for a ruling on the parties' exceptions and a final decision on the merits. Md. Code, State Government ("SG") § 10-205 (authorizing the CPD to delegate a contested case to the OAH for proposed findings of fact and conclusions of law); SG § 10-220 (requiring the CPD to review the OAH's proposed findings and conclusions and to issue a final order).

---

[1] Where the Consumer Protection Division is acting as a party in the instant case, we will refer to it as the "Division." Where it was acting in a quasi-judicial capacity, we will refer to it as the "CPD."

In its final order, the CPD found that Cricket, prior to the Companies' merger in 2014, had violated the CPA by selling cellular devices that operated only on Cricket's CDMA network without informing consumers about the planned decommissioning of that network and that, following the merger, the Companies had violated the CPA by failing to make clear and conspicuous disclosures informing consumers that Cricket's "CDMA-only" devices would no longer operate upon the planned decommissioning of Cricket's CDMA network. The CPD ordered the Companies to (1) "cease and desist" from engaging in practices violative of the CPA and, more specifically, from offering or selling cellular devices under circumstances similar to those that led to the instant action; (2) to pay restitution to certain consumers who had purchased CDMA-only devices between June 2013 and April 2015; and (3) to pay a civil penalty totaling $3,250,000.00.

The Companies filed a petition for judicial review of the CPD's final order in the Circuit Court for Baltimore City. Following a hearing, that court entered an order reversing the CPD's finding that the Companies had violated the CPA prior to the merger. The circuit court also found that the CPD had failed to give the Companies an opportunity to present evidence on the issue of penalties and remedies and remanded to the CPD for an evidentiary hearing on those issues. The court affirmed all of the CPD's other relevant findings including its finding that the Companies had violated the CPA following the merger.

The Division noted an appeal of the circuit court's order, and the Companies noted a cross-appeal. For the purposes of this opinion, we have rephrased and reordered the questions presented as follows:

1. Were all of the Division's CPA claims against the Companies barred by the one-year statute of limitations set forth in § 5-107 of the Courts and Judicial Proceedings Article ("CJP") of the Maryland Code?

2. Did Cricket's pre-merger actions give rise to a viable CPA claim and, if so, was the claim preempted by federal antitrust law?

3. Did the CPD based on substantial evidence reasonably determine that the Companies' post-merger disclosures violated the CPA?

4. Did the circuit court err in refusing to vacate the CPD's cease-and-desist order as moot and/or overbroad?

5. Did the circuit court err in reversing the CPD's determination of remedies and ordering a remand for an evidentiary hearing on the issue?

As to question 1, we hold that the statute of limitations set forth in CJP § 5-107 is not applicable in the instant case. As to question 2, we hold that Cricket's pre-merger actions did give rise to a viable CPA claim that was not preempted by federal antitrust law. As to question 3, we hold that the CPD's determination regarding the Companies' post-merger disclosures was reasonable and supported by substantial evidence. As to question 4, we hold that the circuit court did not err in refusing to vacate the CPD's cease-and-desist order. As to question 5, we hold that the circuit court erred in reversing the CPD's decision regarding remedies and ordering a remand for an evidentiary hearing. Accordingly, we affirm in part and reverse in part the circuit court's judgment.

## BACKGROUND

In 2009, both Cricket and AT&T were offering and selling cellular phones and services to Maryland consumers. Many of the phones Cricket was selling were operable only on Cricket's CDMA network (the "CDMA-only phones"). AT&T's devices operated

3

on AT&T's Global System for Mobiles ("GSM") and Long-Term Evolution ("LTE") networks.

AT&T announced a plan to acquire Cricket by way of a merger with Cricket's parent company, Leap Wireless International, Inc. ("Leap") on July 12, 2013. The post-merger plan was for AT&T to continue operating Cricket's phones that were not CDMA-only phones, through AT&T's GSM network, and to decommission Cricket's CDMA network. With the decommissioning of the network, a CDMA-only phone purchased from Cricket would be inoperable and have to be replaced with one that was operable on AT&T's GSM network. Relevant to this appeal, the decommissioning plan was not made known to the public.

The Companies submitted an application to the Federal Communications Commission ("FCC") for approval of the merger in August 2013. While approval was pending, Cricket continued selling CDMA-only phones to Maryland consumers without informing them of the plan to decommission Cricket's CDMA network if the merger was approved. By March 18, 2014, when the FCC approved the merger, Cricket had sold at least 50,000 CDMA-only phones to Maryland consumers without informing them of the plan to decommission the CDMA network.

For approximately two months following FCC approval of the merger, Cricket and its agents continued selling CDMA-only phones, approximately 1,500 in total, to Maryland consumers. Unlike the pre-merger sales, the post-merger sales came with disclosures regarding the decommissioning of the CDMA network. Those disclosures included

4

affixing stickers announcing the plan to retail phone boxes and in-store price cards. A disclosure was also provided through websites and customer service agents.

*The Division's CPA Action*

On June 9, 2020, the Division filed with the CPD a statement of charges against the Companies alleging that they had violated the CPA in the sale of CDMA-only phones following the announcement of the merger. Under the CPA, a merchant "may not engage in any unfair, abusive, or deceptive trade practice" in the sale of consumer goods. Md. Code, Commercial Law ("CL") § 13-303. The act defines unfair, abusive, or deceptive trade practices to include any "[f]ailure to state a material fact if the failure deceives or tends to deceive[.]" CL § 13-301(3). The CPD is authorized by the CPA to receive and investigate complaints under the CPA, to initiate its own investigation of any unfair or deceptive trade practices, and to issue a cease-and-desist order upon a finding that a particular practice is unfair or deceptive. CL § 13-204. If, in pursuing a cease-and-desist order, the CPD finds that an alleged violator engaged in unfair or deceptive trade practices, the CPD may also award restitution and impose civil penalties. CL §§ 13-403, 13-410.

In the instant case, the Division alleged that Cricket had engaged in deceptive trade practices by selling CDMA-only phones without adequately informing consumers about the plan to decommission the CDMA network. The Division asked that the Companies be ordered to "cease and desist from engaging in deceptive trade practices[,]" to pay restitution to aggrieved customers, and to pay a civil penalty.

5

### *Motions for Summary Decision*

Because the salient facts surrounding the statement of charges were not in dispute, both parties moved for summary decision pursuant to section 28.02.01.12 of the Code of Maryland Regulations ("COMAR"). Under that section, a party may move for summary decision "on the ground that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law." COMAR 28.02.01.12D(1). Pursuant to COMAR 02.01.02.04, the Division delegated the matter to the OAH, with express instructions that it review the matter and issue proposed findings of fact and proposed conclusions of law with "final findings of fact and conclusions of law, determining the appropriate relief, and entering a final order" to be done by the CPD.

### *OAH Hearing and Proposed Findings*

At the hearing before the OAH, the Division argued that Cricket's failure to disclose the plan to decommission its CDMA network prior to the merger was an omission of a material fact that deceived or misled consumers in violation of the CPA. The Division also argued that the Companies' post-merger disclosures of the decommissioning were inadequate.

The Companies argued that all of the Division's claims were barred by the one-year statute of limitations set forth in CJP § 5-107. And because the actions the Division sought to enjoin, namely, the selling of CDMA-only phones, had been discontinued, there was no longer a need for a cease-and-desist order precluding their sale. As to the pre-merger sales, they argued that the failure to disclose the plan to decommission Cricket's CDMA network to customers could not be a violation of the CPA because it was wholly contingent upon

6

FCC approval.  And further, even if those omissions generated a viable CPA claim, the claim would be preempted by federal antitrust law.  As to the post-merger sales, they argued that the various disclosures that were provided sufficiently informed consumers about the planned shutdown of the CDMA network.

At the conclusion of the hearing, the OAH issued proposed findings and conclusions of law in its proposed ruling on the motion for summary decision.  It found that the one-year statute of limitations set forth in CJP § 5-107 did not apply to the administrative proceedings in the instant case, and that a cease-and-desist order would not be moot because the misrepresentations and omissions at issue could reasonably be expected to recur.

As to the pre-merger sales, the OAH found that the Companies were not required to disclose the plan to decommission the CDMA network because actually doing so was contingent upon FCC approval of the merger.  For that reason, the decommissioning was not a "material fact" that was "in existence" when the pre-merger phones were sold.  But even if the failure to disclose the decommissioning of the CDMA network violated the CPA, that claim was preempted by federal antitrust law because, had Cricket informed consumers that the CDMA-only phones may no longer function following the merger, many consumers would leave Cricket for AT&T, thereby exposing AT&T to possible antitrust liability.

As to the Companies' post-merger disclosures, the OAH found that they failed to adequately disclose its plans to decommission the CDMA network in violation of the CPA.  It made the following findings regarding those disclosures:

7

Most post-merger purchases of Cricket cell phones were made in a store. . . . The disclosure consisted of small print statements on stickers[2] placed on the phone boxes and additional small print disclosures on the store's price cards displayed near the boxes.[3]  Although the disclosure sticker was placed directly on the phone box, it measured approximately a meager two inches by three-quarters an inch in height, was outlined in a black border, and was printed on a lighter backdrop.  The small sticker was not prominently displayed on the box where a consumer's eyes would be naturally drawn but rather was placed on the bottom left hand corner of the box.  Not only was the placement of the sticker not readily noticeable, but the print on the sticker was extremely small and difficult to read.  Given the

---

2



3



critical information that the disclosure contained, the prominence of the disclosure in both placement and size was not conspicuous.

In addition to the lack of prominence of the disclosure, the disclosure on the box contained a distracting element. The very first sentence of the disclosure was "Información en español includa." . . . The prominence of the Spanish sentence is confusing and at the very least has the possible effect of diverting consumers from reading further and may suggest to the majority of consumers that the information that followed this sentence was insignificant. Additionally, although the leading sentence of the disclosure is in Spanish, none of the essential terms of the disclosure were written in Spanish, which gives support to the conclusion that the sentence was used as a diversionary tactic to steer consumers away from reading the disclosure.

In addition to the box stickers, a small-print disclosure on the stores' price cards also failed to meet the clear or conspicuous standard. The price card disclosure is even less prominent than the box sticker. The fine-print disclosure was the smallest font on the price card and was placed at the very bottom of the card below the price and phone features. Not only was the print small, but a price card is not a conspicuous location for this disclosure. Consumers generally refer to the price cards to ascertain the cost of the product, and perhaps some features of the phones, but the unsophisticated consumer would not expect to find such an important disclosure within the small print of a price card.

\* \* \*

For the small percentage of consumers, approximately 4-5%, who purchased the phones from the [Companies] online, fine print disclosures were included on the website. For the even smaller number of sales made by telephone, a script informed the consumers of the pending shutdown. There are insufficient undisputed facts and no supporting affidavits for me to conclude that there are no issues of fact regarding these disclosures[.]

(Footnote omitted.)

### *The CPD's Final Order*

Both parties filed exceptions to the OAH's proposed findings and the matter returned to the CPD for a hearing on the exceptions and a final decision on the merits. In its ruling, the CPD disagreed with the OAH's proposed findings and conclusions of law

with respect to the Companies' pre-merger actions. The CPD found that the Companies' plan to decommission Cricket's CDMA network was a "material fact" that should have been disclosed by Cricket to its consumers prior to the merger. The CPD found, therefore, that the Companies had violated the CPA in failing to disclose it prior to the merger. It also determined that the Division's CPA claim was not preempted by federal antitrust law.

The CPD generally adopted the OAH's other relevant proposed findings. More specifically, it agreed: that the Companies' post-merger disclosures were inadequate and thus violative of the CPA; that none of the Division's CPA claims were barred by the one-year statute of limitations set forth in CJP § 5-107; and that the issuance of a cease-and-desist order would not be moot. It, however, amplified the OAH's findings with respect to the Companies' online disclosures following the merger:

> The [Division] states that the record contains substantial evidence regarding the [Companies'] online disclosures submitted by the [Division], none of which was disputed by [the Companies]. Those disclosures were made in three places on the [Companies'] website, two of which would only be visible to consumers if the consumers actively sought out the information. One disclosure was placed on the Cricket website's frequently asked questions page – which consumers would only see if they opted to navigate to the FAQ page – in response to the question "Where can I purchase phones and accessories?" A disclosure was also accessible if consumers clicked on a hyperlink titled "Important Device Purchase Information" that appeared under the CDMA-only phones listed on a page listing multiple phones, which caused the website to automatically scroll down to the very bottom of the page where the disclosure was listed.

> \* \* \*

> The [Companies'] online disclosures were inadequate for many of the same reasons as the in-store disclosures. . . . Two of the three places disclosures were displayed on the website were in places consumers would have to seek out in order to find the frequently asked questions page in response to a question about where phones could be purchased, and at the

10

very bottom of a page listing multiple products that consumers might only see if they scrolled all the way to the bottom or clicked a hyperlink. Even then, as the [OAH] noted, the disclosures were made in fine print. The only other disclosure was made on the product page, again in fine print, and beneath the important information about the phone, such as price, description, features, accessories, and a link to download a user manual. The disclosure is preceded by technical jargon that is likely unclear and potentially distracting to consumers, stating "Cricket is upgrading its CDMA network to 4G GSM and expects to stop offering CDMA service as early as March 2015." As with [the Companies'] in-store disclosures, it is clear that the fine print disclosures on the website were neither sufficient to alert consumers to the fact that the CDMA-only phones they purchased would stop working on the [Companies'] network in a matter of months.

The CPD thereafter incorporated the above findings in its final order. The final order also included a cease-and-desist provision, a restitution provision, and a civil penalty provision. The cease-and-desist provision stated that the Companies must cease and desist from: engaging in unfair or deceptive trade practices in the sale of mobile devices; making any representation that has the capacity to mislead consumers in the sale of mobile devices; failing to state a material fact in connection with the sale of mobile devices; and representing that a mobile device has a characteristic that it does not actually have. That provision also stated that the Companies may not sell mobile devices if the Companies have (or should have) knowledge of a relevant change to the services provided to those devices, unless the change is clearly and conspicuously disclosed.

The restitution provision ordered the Companies to pay restitution "equal to the sum of all monies paid by each consumer in Maryland who purchased a CDMA-only phone from the [Companies] . . . after July 12, 2013 and who was not made aware of the planned shutdown of Cricket's CDMA network[.]" It further stated that the restitution amount shall be reduced by any documented credits or refunds already provided by the Companies to

11

affected consumers. The order included a specific "claims process" through which consumers would be vetted to determine the restitution for which they may be eligible.

In the civil penalties provision, the CPD ordered the Companies to pay a total penalty of $3,250,000.00 for violating the CPA. That sum represented a penalty of $50.00 for each of the 50,000 violations that occurred prior to the merger and a penalty of $500.00 for each of the 1,500 violations that occurred following the merger. The order stated that the CPD, in reaching that sum, considered: the severity of the violation; whether the Companies acted in good faith; any history of prior violations; whether the penalty will achieve the desired deterrent purpose; and whether the issuance of a cease-and-desist order, including restitution, was insufficient to protect consumers. It explained in some detail the CPD's consideration of each of those factors.

### Judicial Review in the Circuit Court

Following the issuance of the final order, the Companies filed a petition for judicial review in the circuit court. That court, after a hearing, entered an order and memorandum of law affirming in part and reversing in part the CPD's final order. The court reversed the CPD's finding that the Companies had violated the CPA prior to the merger. Adopting instead the reasoning of the OAH, it found, as a matter of law, that the plan to decommission the CDMA network was "a non-existent fact" that did not require disclosure. Reversing the CPD's order regarding restitution and civil penalties, it found that the CPD had "failed to give [the Companies] an opportunity to provide evidence on the issue of remedies[,]" and ordered a remand to the CPD "to hold an evidentiary hearing

and take evidence and testimony on the sole issue of remedies."  It affirmed the remainder of the CPD's decision.

Both parties appealed the circuit court's decision.  Additional facts will be supplied in the discussion below.

## STANDARD OF REVIEW

"'In an appeal of the circuit court's review of an agency action, an appellate court reviews the agency's action itself rather than the decision of the circuit court.'"  *Maryland Small MS4 Coal. v. Maryland Dep't of the Env't*, 250 Md. App. 388, 411 (2021) (quoting *Maryland Dep't of the Env't v. Cnty. Comm'rs of Carroll Cnty.*, 465 Md. 169, 201 (2019) ("*Carroll Cnty.*")), *aff'd*, 479 Md. 1 (2022).

In reviewing the agency's action, we apply three standards of review.  First, we review the agency's pure factual findings and conclusions under the "substantial evidence" standard.  *Montgomery Park, LLC v. Maryland Dep't of Gen. Servs.*, 254 Md. App. 73, 98 (2022), *aff'd*, 482 Md. 706 (2023).  We apply that same standard to mixed questions of law and fact, which many agency decisions represent.  A mixed question of law and fact arises "when an agency has correctly stated the law, its fact-finding is supported by the record, and the remaining question is whether the agency has correctly *applied* the law to the facts."  *Crawford v. Cnty. Council of Prince George's Cnty.*, 482 Md. 680, 695 (2023).  In that instance, our task is to determine if the evidence before the agency was "fairly debatable."  *Id.*

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *B&S Mktg. Enters., LLC., v. Consumer Prot. Div.*,

153 Md. App. 130, 151 (2003) (quoting *Md. State Police v. Warwick Supply & Equip. Co.*, 330 Md. 474, 494 (1993)) (further quotation marks and citation omitted). We review the record in a light most favorable to the agency, and, if the record supports the agency's findings, we do not substitute our judgment for that of the agency's, even if we might have reached a different result. *Montgomery Park*, 254 Md. App. at 98-99. In other words, we give deference to the agency's findings of fact, the inferences it draws from those facts, and its application of the relevant law to those factual findings. *Id.*

Second, we generally review the agency's pure legal conclusions *de novo* without deference to the agency. *Id.* But in doing so, we give careful consideration to the agency's interpretation of a law it has been charged by the legislature to administer. *Maryland Small MS4 Coal.*, 250 Md. App. at 412.

Third, we review the agency's discretionary decisions under an "arbitrary and capricious" standard. *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 574 (2015). "This standard is highly contextual, but generally the question is whether the agency exercised its discretion 'unreasonably or without a rational basis.'" *Carroll County*, 465 Md. at 202 (quoting *Harvey v. Marshall*, 389 Md. 243, 297 (2005)).

## DISCUSSION

## I.

## Applicability of CJP § 5-107

### *Parties' contentions*

The Companies contend that the circuit court erred in finding that none of the Division's CPA claims was barred by the one-year statute of limitations set forth in CJP §

14

5-107.  The Division, citing *Nelson v. Real Estate Commission*, 35 Md. App. 334 (1977) and *Maryland Securities Commissioner v. U.S. Securities Corporation*, 122 Md. App. 574 (1998), contends that the statute does not apply to administrative proceedings, as stated by this Court.

*Analysis*

CJP § 5-107 states: "Except as provided in § 5-106 of this subtitle, § 1-303 of the Environment Article, and § 8-1815 of the Natural Resources Article, a prosecution or suit for a fine, penalty, or forfeiture shall be instituted within one year after the offense was committed."  The answer to the question before us centers on whether, under the statute, the action against the Companies constituted a "prosecution" or "suit."

In *Nelson*, this Court held that CJP § 5-107 was inapplicable to "a proceeding before the Real Estate Commission when the subject before the Commission is a determination of whether a license will be suspended or revoked."  *Nelson*, 35 Md. App. at 342.  We noted that, although no Maryland court had held such proceedings exempt from the purview of CJP § 5-107, the Supreme Court of Maryland[4] had previously held in *Anne Arundel County Bar Association, Inc. v. Collins*, 272 Md. 578 (1974), that the statute did not apply to disciplinary proceedings brought by the Attorney Grievance Commission or the Judicial

---

[4] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland.  The name change took effect on December 14, 2022.  *See, also*, Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland….").

15

Disabilities Commission. *Nelson*, 35 Md. App. at 340-41. That Court reasoned that such actions were exempt because they were neither an action at law or equity nor a criminal prosecution, but rather proceedings designed to protect the public from unscrupulous practices by an attorney. *Id.* Perceiving no difference between unscrupulous practice by an attorney and a real estate broker, we applied the same reasoning to disciplinary proceedings before the Real Estate Commission. *Id.* at 341. It explained that the regulatory action of the Real Estate Commission in sanctioning a real estate broker is neither civil nor criminal in nature, and a hearing before such an administrative body is neither a "prosecution" nor a "suit" as those words are used in CJP § 5-107:

> "Prosecution" means a criminal action brought by the State, in a court of competent jurisdiction, by way of indictment, information, or other charging document, against an accused for violation of the common or statutory criminal laws of this State.
>
> "Suit" means an action at law or equity brought in a court having jurisdiction over the subject matter.
>
> The key word in both definitions is "court." Patently, an administrative agency is not a "court" and thus the proscription contained in § 5-107 is not applicable thereto.

*Nelson*, 35 Md. App. at 341.

In his concurring opinion, Judge Lowe viewed the majority's definitions of "prosecution," "court," and "suit" as "restricted." *Id.* at 345-51 (J. Lowe, concurring). He provided broader definitions of those words but concluded that an administrative proceeding before the Real Estate Commission did not fall under the purview of CJP § 5-107, which related to suits and prosecutions for any "fine, penalty, or forfeiture[.]" *Id.* at 352.

In *Maryland Securities Commissioner v. U.S. Securities Corporation*, we reconsidered the holding in *Nelson* within the context of a sanction imposed by the Maryland Securities Commissioner against a licensed securities broker. *Maryland Sec. Comm'r*, 122 Md. App. at 579. In that case, the Commissioner had imposed a $30,000.00 fine against two brokers for misleading investors. *Id.* The brokers sought judicial review in the circuit court, and the court reversed the Commissioner's decision. *Id.* Relying on Judge Lowe's concurring opinion in *Nelson*, the circuit court had found that CJP § 5-107 precluded the Commissioner from bringing the action because it was not brought within one year of the underlying offense. *Id.* at 585, 592.

The Commissioner noted an appeal and this Court reversed, holding that the circuit court had erred in finding that CJP § 5-107 barred the action. *Id.* at 592-93. It explained:

> The circuit court erred in rejecting the clear rationale of the majority opinion in *Nelson*. Instead, it relied on the concurring opinion, which ascribed an overly broad meaning to the words "court," "prosecution," and "suit," placing administrative hearings within their purview. To the contrary, administrative boards and officials are instrumentalities of the executive; although they are sometimes characterized as quasi-judicial, they are not judicial at all. . . . Notwithstanding, therefore, the quasi-judicial nature of some administrative hearings, we hold fast to the definitions of "prosecution" and "suit" that we set forth in the *Nelson* majority as excluding administrative proceedings from the limitations defense embodied in [CJP] § 5-107.

*Id.*

The Companies advance a number of alternative arguments as to why *Nelson* and *Maryland Securities Commissioner* should not apply here or should now be disavowed. We will address them in turn.

First, they argue that *Maryland Securities Commissioner* is distinguishable from the instant case because that case involved a "fine" of several thousand dollars against a securities broker for professional misconduct and this case concerns a private company having to pay a civil penalty of millions of dollars, in addition to restitution and broad injunctive relief. Although *Maryland Securities Commissioner* was made in the context of a fine against a broker for professional misconduct, nothing in the language of that opinion suggests that its holding would apply only in that context or could be, in some way, limited by the amount in controversy. Rather, this Court flatly rejected such an interpretation by stating quite clearly that it was holding fast to the *Nelson* majority's interpretation of "prosecution" and "suit" that excluded administrative proceedings from a limitations defense under CJP § 5-107. 122 Md. App. at 593.

Although the Companies insist that the penalties imposed upon them by the Division constituted a punishment and are thereby "penal" in nature, the Supreme Court of Maryland in *Garrity v. Maryland State Board of Plumbing*, 447 Md. 359 (2016), held that fines imposed by the CPD did not constitute a "criminal punishment." *Id.* at 383-90. The Court further explained that, while some civil penalties are "so punitive in form and effect" that they may be regarded as a criminal punishment, that exception did not apply in that case. *Id.* at 386 (quotation marks and citation omitted).[5]

---

[5] To the extent that the Companies are arguing that the financial penalty in this case is so excessive as to constitute a criminal penalty, we disagree. It was well within the limits of the statute. *Garrity*, 447 Md. at 384-90.

Our Supreme Court reasoned that monetary penalties designed to protect the public, like those imposed for violations of consumer protection laws, generally serve a remedial purpose and have not historically been viewed as punishment, even if such penalties may have a deterrent component. *Id.* at 388. It concluded that, "[b]ecause the CPA is a remedial statutory scheme, monetary penalties for its violations are civil, rather than criminal[.]" *Id.*

Applying that reasoning here, we conclude that the restitution and monetary penalties imposed by the CPD against the Companies were "remedial" and that CJP § 5-107 does not apply to their imposition.

Alternatively, the Companies argue that *Maryland Securities Commissioner* was wrongly decided because we had "explicitly cabined" our decision in *Nelson* to disciplinary proceedings before the Real Estate Commission, and thus erred when we applied *Nelson* outside that context. They urge rejection of the more stringent definitions of "suit" and "court" found in the majority opinion in *Nelson* in this case and the adoption of the more general definitions of "suit" and "court" set forth in the concurring opinion.[6]

In *Maryland Securities Commissioner*, we rejected limiting *Nelson* to its facts. The Companies provide no compelling reason to revisit those cases, and any contention that the

---

[6] The Companies cite *National Union Fire Insurance Co. of Pittsburgh, PA v. Porter Hayden Company*, 408 B.R. 66 (D. Md. 2009) for support of the proposition that "Maryland Courts construing 'suit' in other contexts have rejected *Nelson*'s narrow interpretation of that term." That case involved contract interpretation and not the application of a statute of limitations. *Id.* at 76-77. In refusing to apply *Nelson* in that case, the United States District Court for the District of Maryland expressly stated that *Nelson* was inapposite for that reason. *Id.*

Division's CPA action is something other than an "administrative proceeding" has no support in fact or law.

The Companies also argue that "the argument in *Maryland Securities Commissioner* that charges brought in administrative proceedings protect the public and should thus be exempt from a statute of limitations is unpersuasive." As they see it, allowing the Division to "pursue years-old CPA claims does not serve the public" and is contrary to the generally recognized purpose of the statute of limitations, which is suppressing stale claims and avoiding problems associated with unnecessary delays in bringing a cause of action.

We do not agree. First, the *Maryland Securities Commissioner* Court did not "argue" that administrative proceedings should be exempt from CJP § 5-107 because such proceedings protect the public. That Court's "argument" was premised on *Nelson*, which, in turn, had looked to an earlier Supreme Court of Maryland case.

Finally, the Companies contend that limiting the definition of "suit" to mean only "civil claims brought in court does not make sense[.]" Noting that Maryland law imposes a three-year statute of limitations for private civil actions and a one-year statute of limitations for enforcement actions seeking penalties, they argue that limiting that definition of "suit" to court actions "ignores that the point of Section 5-107 was to make *government enforcement actions* subject to a shorter limitations period than private suits."

To the extent that the Companies are arguing that the holdings in *Nelson* and *Maryland Securities Commissioner* do not apply to an administrative CPA action or that exempting CPA action from the limitations of CJP § 5-107 conflicts with its purpose, we remain unpersuaded. Those cases clearly limit CJP § 5-107 to "court" actions. The CPD

20

is not a "court," and the proceedings are not a "court action." *See Motor Vehicle Admin. v. Weller*, 390 Md. 115, 133-39 (2005) (explaining why an administrative hearing is not a "court action").

Moreover, that the holdings in *Nelson* and *Maryland Securities Commissioner*, reflect legislative intent, is supported by the subsequent legislative history of CJP § 5-107 and related statutes. Prior to 2004, CJP § 5-107 read: "A prosecution or suit for a fine, penalty, or forfeiture shall be instituted within one year after the offense was committed." CJP § 5-107 (2002 Replacement Volume). At that time, a prosecution for a misdemeanor under CJP § 5-106 was also subject to a one-year statute of limitations. Unlike CJP § 5-107, however, CJP § 5-106 contained a number of exceptions to the one-year limitations period. *Id.* In 2004, the General Assembly amended CJP § 5-107 to read: "Except as provided in § 5-106 of this subtitle, a prosecution or suit for a fine, penalty, or forfeiture shall be instituted within one year after the offense was committed." 2004 Maryland Laws ch. 258. As a result of that amendment the same exceptions applying to the one-year limitations for the prosecution of a misdemeanor would apply to prosecutions or suits for "a fine, penalty, or forfeiture."

In 2008, the General Assembly amended CJP § 5-107 to reflect a change it had made to the statute of limitations for violations of certain portions of the Environment Article. 2008 Maryland Laws ch. 193. The change to the Environment Article was codified in § 1-303, which read: "A criminal prosecution or suit for a civil penalty for violation of any provision of this article or any rule, regulation, order, or permit adopted or issued under this article, shall be instituted within 3 years after the date the Department knew or

21

reasonably should have known of the violation." 2008 Maryland Laws ch. 193. In other words, if the Maryland Department of the Environment ("MDE") wanted to initiate a "criminal prosecution" or a "suit for a civil penalty," it had to bring the action within three years. The purpose of that change was to "provide consistency and certainty among the regulated community regarding the statute of limitations for criminal prosecution or civil suit for penalty for specified violations of environmental law." *Id.* The legislature amended CJP § 5-107 to reflect that change: "Except as provided in § 5-106 of this subtitle and § 1-303 of the Environment Article, a prosecution or suit for a fine, penalty, or forfeiture shall be instituted within one year after the offense was committed." *Id.*

CJP § 5-107 was amended to its current form in 2014. 2014 Maryland Laws ch. 380. As in 2008, the amendment reflected in part a change the legislature had made to § 8-1815 of the Natural Resources Article adding a three-year statute of limitations for "a criminal prosecution or a suit for a civil penalty" for certain violations under that subtitle. *Id.* CJP § 5-107 now reads: "Except as provided in § 5-106 of this subtitle, § 1-303 of the Environment Article, and § 8-1815 of the Natural Resources Article, a prosecution or suit for a fine, penalty, or forfeiture shall be instituted within one year after the offense was committed."

In 2015, the General Assembly amended § 1-303 of the Environment Article to include a five-year statute of limitations for "an action for an administrative penalty" for certain violations of that article. 2015 Maryland Laws ch. 254. As discussed above, if the MDE initiated "a criminal prosecution or a suit for a civil penalty" for certain violations under that article, it needed to bring the action within three years after it knew or reasonably

22

should have known about the violation. 2008 Maryland Laws ch. 193. But, as a result of the 2015 amendment, if the MDE sought an administrative penalty (as opposed to a criminal prosecution or a suit for a civil penalty), it had five years to bring such a claim. 2015 Maryland Laws ch. 254. In its Fiscal and Policy Note, the legislature explained the state of the law and its potential fiscal impact as follows:

> According to the most recent MDE annual enforcement report, the department collected about $3.6 million in civil and administrative fine revenues in fiscal 2014. The annual enforcement report does not account for civil and administrative fine revenues separately, although the number of civil and administrative enforcement *actions* taken is reported separately. While the vast majority of enforcement actions involving the assessment of penalties are administrative, penalties collected in civil suits are often much greater than the penalties collected in administrative actions.

> **State Revenues:** A reliable estimate of any change in penalty revenues collected by MDE cannot be made, as it is dependent on future MDE enforcement decisions. However, general and/or special fund revenues may increase for several years beginning in fiscal 2016 to the extent that MDE accelerates the enforcement of administrative actions to comply with the reduced limitations period.

Maryland Fiscal and Policy Note, 2015 Session House Bill 509.

That legislative backdrop provides further support to the conclusion that the one-year statute of limitations set forth in CJP § 5-107 does not apply to the Division's administrative action in the instant case. Like MDE, the CPD is authorized to pursue monetary penalties in either "a civil action or an administrative cease and desist action[.]" CL § 13-410(c). The choice of action governs the limitations analysis because, as the General Assembly recognized in amending § 1-303 of the Environment Article, the distinction between a "civil suit" and an "administrative action" is clear in the application of CJP § 5-107. While the three-year statute of limitations under § 1-303 of the

Environment Article applied to a "civil suit" brought by the MDE, the imposition of limitations on its "administrative actions" involved a legislative amendment.

In this case, the General Assembly has empowered the CPD to pursue civil penalties in either a "civil action" or an "administrative action," but the limitations in CJP § 5-107 only apply to civil actions or prosecutions. Despite a clear understanding of how and its willingness to do so when it finds it appropriate, the General Assembly has not imposed a limitations period for the CPD's administrative actions. Here, the instant administrative action was not a "civil suit" or a "civil action," and the one-year statute of limitations in CJP § 5-107 does not apply. *See Weller*, 390 Md. at 133-39 (explaining why an administrative hearing is not a "civil action").

## II.

## A.

### The Disclosures of the Decommissioning Plan

*Parties' contentions*

The Division contends that the circuit court erred in reversing the CPD's determination that the Companies' pre-merger actions violated the CPA. It argues that the plan to shut down Cricket's CDMA network, which would render the CDMA-only phones inoperable, was a "material" omission and that the failure to disclose it to consumers was a violation of the CPA. The Companies contend that Cricket was not required to disclose the plan because it was contingent on FCC approval, and therefore not a fact "in existence" at the time the CDMA-only phones were sold.

*Analysis*

Under the CPA, a company engages in an "[u]nfair, abusive, or deceptive trade practice[]" when it fails "to state a material fact if the failure deceives or tends to deceive[.]" CL § 13-301(3). "An omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action." *Golt v. Phillips*, 308 Md. 1, 10 (1986). Ordinarily, the issue of materiality is one of fact and not of law. *Green v. H&R Block, Inc.*, 355 Md. 488, 524 (1999). "Only when the facts do not allow for a reasonable inference of materiality or immateriality should the issue be decided as a matter of law." *Id.* (citing *Golt*, 308 Md. at 10).

Here, the CPD concluded that the Companies' plan to decommission the CDMA network if the merger was approved was an undisputed "material" fact. The circuit court reversed because, in its opinion, Cricket, as a matter of law, was not required to disclose the planned decommissioning of the networks on which its phones functioned. The central question is whether the plan to decommission the CDMA network was "immaterial" as a pure matter of law until the decommissioning was approved by the FCC or is it a mixed question of law and fact? If the latter, we ask whether the CPD's "materiality" finding was supported by substantial evidence that was fairly debatable? More particular to this case, we ask whether the evidence supports a reasonable inference that a significant number of unsophisticated consumers would, in purchasing a CDMA-only phone, attach importance to that fact that their phone could stop operating if the merger was approved.

25

We hold that the Companies' plan to decommission the CDMA network was not immaterial as a matter of law. And it was reasonable to find that in deciding whether to purchase a CDMA-only phone, a significant number of unsophisticated consumers would have attached importance to the Companies' plan to decommission the CDMA network because it would render the purchased phones inoperable. In fact, the Companies all but conceded that point in the Memorandum they submitted to the circuit court in seeking judicial review. In that Memorandum, arguing that disclosure of their plans prior to the merger would have exposed them to liability under federal antitrust laws, the Companies stated:

> In order to implement the pre-merger disclosures the CPD demands, Cricket would have had to instruct sales people to make verbal statements and respond to customer questions concerning the proposed merger, and post signage and provide other written documentation to consumers. No matter how carefully Cricket employees attempted to convey information concerning the proposed merger and the possible impact on CDMA phones, many, if not most, potential customers would have been frightened away from purchasing Cricket phones. They would have simply taken their business elsewhere. Conveying information concerning the merger would have undoubtedly resulted in Cricket selling less service and fewer phones. Telling customers that the phones they are contemplating purchasing will not work on the Cricket network if and when AT&T is permitted to shut down the Cricket network would have impermissibly weakened Cricket's competitive position during the pre-merger regulatory period.

That statement indicates why the plan to decommission the CDMA network was a material fact notwithstanding the contingency of FCC approval. As the Companies acknowledged, a significant number of potential consumers would have attached importance to the fact that the phone they were purchasing would no longer work "if and when" the FCC permitted the CDMA network to be shut down. Thus, unlike cases on

26

which the Companies rely, that plan was in existence at the time the pre-merger CDMA-only phones were sold. *Compare Maryland Real Est. Comm'n v. Garceau*, 234 Md. App. 324, 357 (2017) (holding that a real estate agent could not be sanctioned for failing to disclose non-existent HOA covenants, as that "fact" could not be considered material).

Because the plan was contingent on FCC approval, the Companies argue that Cricket had no control over whether the plan came to fruition and that a statement regarding future events over which the declarant has no control cannot be considered material and disclosures cannot be required. As they see it, requiring disclosure of a plan contingent on a third-party's approval would force the Companies "to play fortune teller and leave them holding the bag if they predicted wrongly or the FCC did not go along with their plans."

We do not find that argument persuasive. Cricket controlled entering into a merger agreement with AT&T that contemplated shutting down the CDMA network if approved by the FCC. Disclosure of the planned decommissioning did not require "fortune telling" because the plan itself was a "material fact." To be sure, disclosure presented a risk of lost sales, but it also provided meaningful information to a potential purchaser. We hold that the circuit court erred in reversing the CPD's determination that Cricket had violated the CPA by failing to disclose the decommissioning plans prior to the merger.

## B.

## Federal Preemption

### *Parties' contentions*

Even if their pre-merger plan was material, the Companies contend that the Division's CPA claims were preempted by federal antitrust laws including the Sherman

Act, 15 U.S.C. § 1, and the Clayton Act, as amended by the Hart-Scott-Rodino Act, 15 U.S.C. § 18a(b). They argue that telling customers about the plans to decommission the CDMA network would have "shifted business from Cricket to AT&T," which would constitute "impermissible pre-merger coordination" or, at the very least, "frustrated the purpose of the federal antitrust laws" by causing "a loss in Cricket's market position." (Quotation marks and citation omitted.) They insist that "[t]hat type of pre-merger change in competitive position is exactly what the antitrust laws seek to prevent."

The Division contends that the antitrust laws do not extend to "wholly unilateral" conduct and that a company selling fewer goods does not preempt enforcement of the CPA.

*Analysis*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade[.]" 15 U.S.C. § 1. In other words, it "applies only to concerted action that restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). It "does not reach conduct that is 'wholly unilateral.'" *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). "The key" then is "whether the alleged contract, combination[,] or conspiracy is concerted action – that is, whether it joins together separate decisionmakers." *Am. Needle*, 560 U.S. at 195 (quotation marks and citation omitted). Because it "does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (cleaned up). Cricket and AT&T entered into a merger agreement but

there is no evidence or allegation of concerted action or that the merger agreement or any other agreement between them required or encouraged the denial of information to Cricket's pre-merger customers about the planned decommissioning of the CDMA network. That appears to have been a wholly unilateral action to reduce inventory.

But even if Cricket's failure to disclose the plan could in some way be considered a concerted action, the Companies have presented no persuasive evidence or argument as to how disclosure would have resulted in a true "restraint of trade." Whether particular acts constitute a restraint of trade is generally assessed under the "rule of reason." *Nat'l Collegiate Athletic Ass'n v. Alston*, -- U.S. --, 141 S. Ct. 2141, 2151 (2021). That "requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the restraint's actual effect' on competition." *Ohio v. Am. Express Co.*, -- U.S. --, 138 S. Ct. 2274, 2284 (2018) (quoting *Copperweld*, 467 U.S. at 768) (brackets omitted). "The goal is to 'distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" *Id.* (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)) (brackets omitted).

To show how Cricket's disclosure of the decommissioning plan restrained trade or had an anticompetitive effect, the Companies appear to rely on the fact that disclosure would have caused some consumers to purchase AT&T phones instead of Cricket's, thereby decreasing Cricket's market share. This argument is somewhat undermined by statements made by the Companies in their FCC filing which they argue was to simply explain that the merger could have minimal effect in the prepaid market because AT&T's

offering was "still young" with a small market compared to Cricket's "prepaid wireless business." What the Companies stated was that AT&T and Cricket's parent company, Leap, "are not close competitors" and that the phones each sold "are not close substitutes" for one another. Moreover, the disclosure, if it were a restraint on trade, would appear to be a restraint that was in the consumer's best interest and they would still be buying phones in a competitive marketplace. A reduced market share, alone, is, in our view, insufficient to trigger an antitrust violation.[7]

The Companies' reliance on cases involving "gun-jumping" is equally unavailing. Federal law requires merging entities to notify the government about the merger and to wait thirty days from the date of notification before consummating the merger. 15 U.S.C. § 18a. "Gun-jumping" occurs when the merging entities take "collaborative actions to further the merger process before the end of the thirty-day waiting period." 1 Materials on Antitrust Compl. § 12:22 (3rd ed., February 2023). Requiring Cricket to inform consumers about the plan to decommission the CDMA network could not reasonably be considered "gun-jumping" because it would not be a "collaborative action" in furtherance of the merger process.

In short, we find no support in the record or the relevant case law for the Companies' claim that enforcement of the CPA with respect to Cricket's pre-merger actions would

---

[7] Some acts are considered *per se* violations because they "always or almost always tend to restrict competition and decrease output[.]" *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979). We do not believe that the acts at issue here would constitute *per se* violations, and the Companies do not argue otherwise.

implicate federal antitrust laws. Accordingly, the circuit court did not err in affirming the CPD's decision.

## III.

## Post-merger Disclosures

### *Parties' contentions*

The Companies contend that the circuit court erred in affirming the CPD's determination that the Companies' post-merger disclosures were deceptive or misleading. They argue that the CPD's decision "was neither supported by substantial evidence nor reasonable." As they see it, "no reasonable mind could find that the disclosures alone show that AT&T attempted to mislead consumers or conceal that CDMA phones would stop working after March 2015." They also argue that the CPD "put forth no evidence" that the disclosures misled consumers, conducted "any studies to determine how customers would perceive AT&T's disclosures, or put forth expert testimony." They argue that the CPD did not view the disclosures "in the light most favorable to [the Companies] as it was required to do before finding liability at the summary disclosure stage." (Quotation marks and citation omitted.)

The Division contends that the CPD's determination was reasonable and supported by the disclosures contained in the record. It asserts that other than the disclosures themselves, nothing else was required to support its determination. And that the CPD's expertise in evaluating the disclosures is entitled to considerable deference.

*Analysis*

The CPA states that "[a]ny practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." CL § 13-302. The Supreme Court of Maryland has rejected claims that the CPD, in determining whether an advertisement misled consumers, must consider evidence beyond the advertisements themselves before making a decision. *See*, *e.g.*, *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 161-63 (2005); *Consumer Prot. Div. Off. of Att'y Gen. v. Consumer Publ'g Co., Inc.*, 304 Md. 731, 770-71 (1985). That Court explained that, by enacting § 13-302 of the CPA, the General Assembly had concluded that the CPD "has the expertise necessary to make that determination without testimony by consumers or consumer experts." *Morgan*, 387 Md. at 163.

Here, before determining that the disclosures were deceptive and misleading, the CPD reviewed the disclosures. Based on our review, we are persuaded that there was substantial evidence to support the CPD's determination and that no additional evidence was needed. *See Consumer Publ'g*, 304 Md. at 770-71 (affirming the CPD's finding of a CPA violation that was based solely on the advertisements at issue). Four disclosures are at issue in this case.

The first disclosure was by a sticker affixed to the CDMA-only phone's retail box that included the following language:

> Información en español includa.
> Cricket is upgrading its CDMA network to 4G GSM and expects to stop offering CDMA wireless service as early as March 2015. **This CDMA**

32

**phone will no longer work on our wireless network after we complete this upgrade.**

See Cricket's updated Terms and Conditions of Service, which includes your agreement to dispute resolution through binding individual arbitration instead of jury trials or class actions at www.cricketwireless.com.

The second was printed on a sticker affixed to price cards displayed in retail stores and included identical language. The third, with similar language, was displayed on specific pages on the Companies' websites. The fourth was in a script provided to the Companies' customer service representatives.

In the OAH's proposed findings, which the CPD adopted, the OAH found that "[m]ost post-merger purchases of Cricket cell phones were made in a store" and that the in-store disclosures "consisted of small print statements on stickers placed on the phone boxes and additional small print disclosures on the store's price cards displayed near the boxes." The disclosures on the phone boxes were approximately two inches by three-quarters an inch in height and were "not prominently displayed on the box where a consumer's eyes would be naturally drawn but rather was placed on the bottom left hand corner of the box." In addition, "the print on the sticker was extremely small and difficult to read" and "a distracting element" at the top, read: "Información en español includa." It found this "confusing" because "none of the essential terms of the disclosure were written in Spanish[.]"

As for the stickers on the price cards, the OAH found that those disclosures were in "the smallest font on the price card" and "even less prominent than the box sticker." They were "placed at the very bottom of the card below the price and phone features[,]" which

was "not a conspicuous location for this disclosure." As for the disclosures made on the websites and through customer service operators, the OAH found that only about four to five percent of the customers had purchased CDMA-only phones on the website and that an even smaller number had purchased them by phone.

The CPD added to those findings that the online disclosures were displayed "in places consumers would have to seek out in order to find" and, more importantly, "at the very bottom of a page listing multiple products that consumers might only see if they scrolled all the way to the bottom or clicked a hyperlink." The CPD also noted that "the disclosures were made in fine print" and that at least one of the disclosures was "preceded by technical jargon that is likely unclear and potentially distracting to consumers[.]" As to the disclosures provided to the Companies' customer service representatives, the CPD noted that it was "undisputed" that those disclosures were not given to the public and would, "at most," provide additional information to consumers "who had already seen a disclosure" and would be given to the consumer only if they asked questions.

After reviewing the disclosures at issue, we hold that the OAH's and CPD's added findings as to the characteristics of the disclosures and their potential effect on consumers were supported by substantial evidence. From them, a reasonable mind could have concluded that the disclosures had the capacity, tendency, or effect of deceiving, misleading, or damaging consumers. Based on the language of the CPA, it was unnecessary to establish that a consumer "in fact ha[d] been misled, deceived, or damaged" by the disclosures. CL § 13-302.

34

**Mootness/Overbreadth**

*Parties' contentions*

The Companies contend that the circuit court erred in refusing to reverse the CPD's cease-and-desist order because it is moot. They argue that the issued order is moot because the enjoined action – the selling of CDMA-only phones – was discontinued several years ago. They also contend that, because the order is not limited to the claims at issue and imposes requirements that "amount to the general principles that are applied to determine whether a statement is deceptive[,]" it is "overbroad."

The Division contends that the cease-and-desist order is not moot because the Companies failed to establish that the alleged misconduct could not reasonably be expected to recur. The Division contends that the Companies' argument regarding the breadth of the order is both unpreserved and without merit.

*Analysis*

Section 13-403 of the CPA authorizes the CPD to issue a cease-and-desist order upon a finding that an alleged violator has engaged in unfair or deceptive trade practices. CL § 13-403(b)(1)(i). In that order, the CPD may not only prohibit past behavior but also "'*future* acts that involve the same violation or unlawful practice[.]'" *Luskin's, Inc. v. Consumer Prot. Div.*, 353 Md. 335, 380 (1999) (quoting *Luskin's, Inc. v. Consumer Prot. Div.*, 338 Md. 188, 198 (1995)).

Ordinarily, a cease-and-desist order becomes moot when "'the acts sought to be enjoined have been discontinued or abandoned.'" *State v. Neiswanger Mgmt. Servs., LLC*,

457 Md. 441, 455 (2018) (quoting *Att'y Gen. v. Anne Arundel Cnty. Sch. Bus Contractors Ass'n, Inc.*, 286 Md. 324, 327 (1979)). A party's voluntary cessation of the enjoined conduct, however, does not mandate dismissal of a cease-and-desist order. *Id.* at 456. The enjoined party has the burden to show that the misconduct at issue "could not reasonably be expected to recur." *Id.* (quotation marks and citation omitted). That burden is "heavy," and the standard for determining its satisfaction is "stringent." *Id.* As the Supreme Court of Maryland has explained:

> A "reasonable expectation of recurrence" may exist when the alleged misconduct was a "continuing practice or was otherwise deliberate." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184-85 (11th Cir. 2007). Mootness is more likely if cessation was "motivated by a defendant's genuine change of heart rather than his desire to avoid liability." *Id.* at 1186. This may be shown by the factual circumstances, particularly the relationship between the cessation and pending litigation. *Id.* (collecting cases). Refusal to acknowledge misconduct tends to support a conclusion that the cessation was motivated by a desire to evade liability, leaving a "live dispute" between the parties. *Id.* at 1187.

*Id.* at 456-57.

We hold that the circuit court did not err or abuse its discretion in refusing to dismiss the CPD's cease-and-desist order as moot. That there has been no acknowledgment of wrongdoing in this case "tends to support a conclusion" that the cessation of the determined misconduct was mere happenstance rather than a genuine change of heart. *Id.* at 456.

Citing *Plank v. Cherneski*, 469 Md. 548, 609-10 (2020), the Companies argue that "injunctive relief should not issue based on a 'speculative' possibility of future similar action." That argument fails for multiple reasons. Foremost, the Supreme Court of Maryland in *Plank* did not state that injunctive relief "should not be based upon a

36

speculative possibility of future similar action." In the portion of the opinion cited by the Companies, the Court simply indicated that injunctive relief was a "preventative and protective remedy, *aimed at future acts*, and it is not intended to redress past wrongs." *Id.* at 609 (quotation marks and citations omitted). In other words, penalizing past conduct should not be its sole purpose.

In addition, the Companies appear to ignore their burden to demonstrate that their past behavior could not reasonably be expected to recur in order to prove mootness. Their argument appears to rest on "the sales [of CDMA-only phones having] ceased six years before the Final Order." But as the Division argues, the refusal to admit wrongdoing lends support to a conclusion that "on the *next* occasion when they decide to discontinue a wireless network [and] continue to have large quantities of devices in their inventory that will function only on that network, they would, in the absence of an injunctive order, behave as they did here."

The Companies also argue on appeal that the cease-and-desist order was "too broad." That argument, however, was unpreserved because at no point at either the administrative level or before the circuit court, did the Companies advance that specific argument. Md. Rule 8-131(a); *see also Concerned Citizens of Cloverly v. Montgomery Cnty. Plan. Bd.*, 254 Md. App. 575, 601 (2022). The Companies' sole argument was that the order was moot.

# V.

## Remedies and the Need for an Evidentiary Hearing

### *Parties' contentions*

The Division contends that the circuit court "overstepped" its authority and thus erred when it reversed the CPD's decision with respect to remedies and remanded for an evidentiary hearing.

The Companies, contending that the circuit court ruled correctly, assert that they "must be given the opportunity to present evidence relevant to remedies before penalties and restitution are imposed" in order for the CPD to properly consider the statutory factors set forth in § 13-410 of the CPA and whether customers were injured at all, given the FCC mandated phone replacement program. Such evidence it maintains is relevant to both "whether restitution is warranted" and "the amount of penalties."

### *Analysis*

In a cease-and-desist action, when the CPD, following a hearing, determines "on the preponderance of evidence that the alleged violator violated [the CPA], the [CPD] shall state its findings and issue an order requiring the violator to cease and desist from the violation and to take affirmative action, including the restitution of money or property." CL § 13-403(b)(1)(i). "When a violator's misrepresentations and deceptions affect a number of similarly situated individuals . . . the [CPD] may issue a general order of restitution." *Morgan, supra*, 387 Md. at 165. A general order of restitution may be based on the circumstances of the violation, and does not require consumer testimony or other direct proof of consumer reliance. *Consumer Publ'g, supra*, 304 Md. at 780-81. But to

award restitution to individual consumers, "the [CPD] then must establish a procedure to determine whether individual consumers relied on the misrepresentations." *Morgan*, 387 Md. at 165.

That is exactly what the CPD did in approximately three pages of the Final Order. That procedure provided the Companies the opportunity to provide information regarding what the consumer paid for the CDMA-only phones, the amount of any refund, any credits toward a replacement phone, any amount received for the replacement phone, or any "substantially equivalent" replacement phone he or she received "free of charge." In the order, the CPD estimated that, "[w]ithout accounting for the costs of the claims process," the initial payment of $500,000 represented a "disgorgement of just under $10.00" for the CDMA-only phones sold without notice or adequate notice of the CDMA network shutdown. That process provides an "opportunity," which the Companies claim they were not given, to prove whether consumers were actually damaged by their purchase of the CDMA-only phone. In short, that was not required prior to the finding of a CPA violation.

As for the imposition of civil penalties, the CPA states that "[a] merchant who engages in a violation of this title is subject to a fine not exceeding $10,000 for each violation." CL § 13-410(a). As discussed previously, such fines "are civil penalties and are recoverable by the State in . . . an administrative cease and desist action under § 13-403(a) and (b) of this subtitle[.]" CL § 13-410(c). In setting the amount of the civil penalty imposed in an administrative proceeding, the CPD must consider:

(1) The severity of the violation for which the penalty is assessed;

(2) The good faith of the violator;

(3) Any history of prior violations;

(4) Whether the amount of the penalty will achieve the desired deterrent purpose; and

(5) Whether the issuance of a cease and desist order, including restitution, is insufficient for the protection of consumers.

CL § 13-410(d).

Here, after the CPD issued a statement of charges to the Companies, there was a hearing through the OAH on those charges. After the OAH issued its proposed findings and the parties filed exceptions, another hearing was held by the CPD. At the conclusion of that hearing, the CPD, finding that the Companies had violated the CPA, issued a general order of restitution and, in addition to the restitution procedure discussed above, imposed a civil penalty of $50.00 for each of the 50,000 violations that occurred prior to the merger and a civil penalty of $500.00 for each of the 1,500 violations that occurred following the merger. In setting those amounts, the CPD did consider, in some detail, each of the five factors set forth in § 13-410(d) of the CPA.

It found the violations to be severe because both before and after the merger the Companies were aware that with the CDMA network shutdown, the phones were "practically worthless." The omission of that shutdown harmed consumers financially and benefited the Companies in the sell-off of the CDMA-only inventory. The trade-in credits it found did not negate the severity of the violations because credits were mandated by the FCC and were not offered until notice of the shutdown. The Companies also acted in bad faith before the approved merger because the disclosures were insufficient – though not as

40

bad as the post-merger disclosures – because no warning of the shutdown was given. But when they announced the proposed merger before its approval, the announcement only disclosed the upgrade to AT&T but not the impact of the shutdown on the CDMA network. Noting no evidence of similar violations, it found the violations to be "numerous, long lasting, and statewide" and that an injunctive provision and restitution was not sufficient to protect consumers from future violations.

Clearly the CPD considered the statutory factors in its civil penalty decision. We hold that the circuit court erred in reversing the CPD's determination of remedies and in remanding for an evidentiary hearing. The CPD followed the requisite statutory procedures in issuing its general order of restitution and in imposing civil penalties against the Companies. Although the Companies may view the civil penalties in this case as being exorbitant and unreasonable, they were significantly lower than the statutory maximum of $10,000.00 per violation now provided for in CL § 13-410(a) and the $1,000 for each violation provided for prior to October 1, 2018.

## CONCLUSION

In sum, we hold that the statute of limitations set forth in CJP § 5-107 was not applicable in the instant case; that the CPD's determination regarding the Companies' post-merger disclosures was reasonable and supported by substantial evidence; and that the CPD's cease-and-desist order was not moot. We affirm the circuit court's judgment on those issues. We also hold that the Companies' pre-merger actions did give rise to a viable CPA claim; that the CPD complied with the relevant statutory provisions regarding restitution and civil penalties; and that the Companies were not entitled to an evidentiary

41

hearing on the issue of restitution and remedies.  We reverse the circuit court's judgment

on those issues.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART; COSTS TO BE PAID BY APPELLEES/CROSS-APPELLANTS.**